**Christine L. YOUNG, Appellant-Respondent,**

v.

**John Lee YOUNG, II and Gay Ann Young, Respondents-Petitioners.**

**No. KCD 30091.**

Missouri Court of Appeals, Western District.

Oct. 1, 1979.

M. Randall Vanet, Kansas City, for appellant-respondent.

Robert J. Harrop, Gage & Tucker, Kansas City, for respondents-petitioners.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

KENNEDY, Judge.

The case now before us involves the question of a natural mother's willful abandonment of a boy seven years old at trial time, whose adoption is sought by the youth's stepmother, the wife of the natural father. The natural mother, Christine, has refused to give her written consent to the adoption.

The trial court after trial found willful abandonment by the mother and found that her consent to the adoption was not required under § 453.040(4) RSMo 1978. She has appealed from that judgment.

John II and Christine, natural parents of John III, the child sought to be adopted, were divorced in December 1971. John III was then approximately one year old. Christine had had temporary custody of young John during their nine-month separation before the divorce. The divorce decree gave primary custody of the child to his father, with visitation rights to the mother. The mother thereupon surrendered custody to John II.

Christine visited young John once or twice a month until February or March, 1972. These visits were arranged by Christine's calling John II's mother or his brother. She had little contact, John said none, with John himself after the divorce. She never had his telephone number

John was a member of the Kansas City Police Department during the entire period beginning with the divorce and continuing to the time of the trial of the present case. He testified that it was standard procedure for police officers for security reasons to have unlisted telephone numbers, but that he could always be reached through his mother or a relative, or through the Kansas City Police Department. Evidently Christine's only efforts to contact John were through his mother, with the results hereafter indicated.

After February or March, 1972, Christine no longer exercised her visitation rights, and at the time of trial—February 2, 1978—had not seen him since that time. As an explanation for ceasing her visits, she said that it was hard for her to see John's family, that she cried after the visits, and was emotionally unstable. At the time her visits ceased, also, she was expecting another child, who was born August 17, 1972. There had never been any refusal of her visitation rights, Christine said, but "the whole situation was very uncomfortable for me". The resentment toward her when she wanted to see her son was obvious. There was a great deal of animosity between her and her mother-in-law, John's mother, when the divorce was final.

Christine moved from Kansas City to Florida in May, 1974. She called John's mother before she left, to let him know where she was going, "maybe to see John again before I left". John's mother hung up on her.

Christine was back in Kansas City in August of 1974 for a three-day visit. At her request, her mother had called John's mother with the intention of attempting to arrange a visit between Christine and young John while she was home on a three-day visit. John's mother hung up on her.

In July of 1975 Christine was again in Kansas City during a week's vacation. Once again she called John's mother and once again she hung up the phone.

In December, 1976, Christine was again in Kansas City on vacation. This time she called John's mother and asked her to have John call her. John did return her call. They arranged a meeting at a bar suggested by him, the "Streetcar Named Desire". Christine said her reason for the meeting was to arrange to see young John. At this meeting which took place in the evening and according to Christine lasted about five hours, John asked her about her signing a consent for young John's adoption. He had told her in their phone conversation that he wanted to discuss that subject with her, and she had contacted her attorney about it before the meeting. She would not agree

to sign the consent and as they parted she said that she would think about it.

According to John's testimony, the subject of young John was not brought up at this meeting except in connection with the consent to the adoption. He testified that Christine did not say in their phone conversation or at the meeting that she wanted to see him.

"I believe she wanted to develop some type of relationship with me," John said.

They talked by telephone again two days later. According to Christine, they agreed that John was to bring young John to Christine's sister's house for a visit at 9 o'clock a. m. on a certain day. John's version was that Christine "ordered" him to bring young John to that address at the specified time. John showed up, but without young John. He was accompanied by a process server who served upon Christine the petition and summons in the present case.

John and his present wife, petitioner Gay Ann Young, were married on August 30, 1973. Young John has lived in their home ever since their marriage. He was four or five years old before he learned that he was not Gay Ann's natural child. John and petitioner Gay Ann have a child born of their marriage, a son named William Michael.

At the time of the trial Christine had returned to and was living in Kansas City with her daughter. She was employed as an administrative assistant to her mother in the operation of a school for retarded children and adults.

We have concluded that the trial court's judgment is to be affirmed, for reasons hereafter set forth.

We place before us *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), under which we affirm the trial court's judgment "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law". The opinion proceeds: "Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree of judgment is wrong."

The term "willful abandonment", as used in § 453.040, is defined in *In re E. C. N.,* 517 S.W.2d 709, 715 (Mo.App.1974), as follows: ". . . [F]irst, a voluntary and intentional relinquishment of the custody of the child to another, with the intent to *never again* claim the rights of a parent or perform the duty of a parent; or, second, an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love and his protection, maintenance, and the opportunity for the display of filial affection . . . The abandonment must be absolute, complete and willful . . . The conduct of a parent . . . must have occurred during the year preceding the filing of the adoption petition; however . . . evidence of a parent's conduct, either before or after the statutory period, may be considered to determine the purpose and intent of the parent . . ." *See also D. G. K. v. D. G. K.,* 545 S.W.2d 81, 82 (Mo.App. 1976).

Intent is to be gathered from the actions of the parties. *In re C., C., & C.,* 380 S.W.2d 510, 515 (Mo.App.1964).

Christine's actions over a period of approximately four and a half years—that is, from March, 1972, to December, 1976—are barren of any evidence of parental interest or solicitude for young John. She ceased to exercise her visitation rights in the early spring of 1972, although apparently she had not experienced any real difficulty in securing her visitation privileges up to that time. Her May, 1974, and her July, 1975, telephone calls to her erstwhile mother-in-law, which might have led to a request to visit the child, were rebuffed, but she did not attempt to reach the child's father by any other avenue. She did not attempt to reach him through the police department or through another relative. A brother of John, for instance, is mentioned as an intermediary while she was exercising her visitation rights before March, 1972.

Neither did she follow through in August, 1974, after her mother failed in her attempt to have a telephone conversation with John's mother.

While it may not be of large significance, considering his tender age, Christine did not at any time during the period under consideration attempt to communicate with young John by mail or telephone, nor did she send him gifts.

■ The parties agree that abandonment can be repented of. *Matter of K. M. B.,* 544 S.W.2d 590, 592–3 (Mo.App.1976); *T. H. v. Ambelang,* 497 S.W.2d 210, 211 (Mo.App. 1973). Appellant points to the December, 1976, meetings between Christine and John as evidence, first, which gives to her earlier actions a slant away from abandonment, *see D. G. K. v. D. G. K., supra* at 83, and also, assuming earlier abandonment, as indicating an intention on Christine's part to reassert her parental rights and to take up again a parental relationship with young John. Appellant does not admit that the evidence supports her abandonment of the child at any time—but says that if it should show such abandonment, then her December 1976 actions show her repentance.

The trial court did not place appellant's construction upon her December 1976 actions. The court in its memorandum opinion said: "From the evidence, the Court gleans there was very little discussion at the bar relative to the welfare of the child. True, she asked to see the pictures of the child which is in and of itself not of sufficient importance to override her past conduct of abandonment. The same is true of the Warwick meeting."

John testified that at the "Streetcar" meeting Christine had said nothing about wanting to see young John, and in their telephone conversation during which the meeting was arranged, she had said nothing about wanting to see the youngster. He testified: " . . . Not one time in the phone conversation or the conversation in the bar did she want to see him, did she even mention him other than the fact that she would not consent to adopt." When asked the reason she wanted to meet him,

John replied: "I believe she wanted to develop some type of relationship with me."

Christine testified that she had made it plain at that meeting that she did wish to see little John, and had asked John if he had any pictures (he didn't). She also said that she had told John in the phone conversation that she wanted to see the child.

■ We must defer to the trial court's choice between conflicting accounts of these conversations, which depend upon the credibility of the witnesses. Rule 73.01(3(b)); *Cook v. Lodes,* 560 S.W.2d 64 (Mo.App. 1977).

■ As to Christine's request to John—or her demand, according to John—that the child be brought to her sister's Warwick address for a visit with her, the trial court did not believe that that single gesture was sufficiently important to indicate repentance on Christine's part or to give a different cast to her neglect over the preceding period of years. *R. F. N. v. G. R.,* 546 S.W.2d 510, 512 (Mo.App.1976). We find no basis for rejecting the trial court's view of the December, 1976, meetings and conversations.

■ Christine attributed her long neglect of her parental rights and responsibilities to financial difficulties and to her emotional instability. She claimed upon trial to have regained her emotional health and said she was prepared to resume her role as non-custodial parent. Although her explanation may have justified her actions on moral grounds, it does not necessarily negative an intent to abandon. The evidence was for the trial court to weigh. *Flarsheim v. Twenty Five Thirty Two Broadway Corp.,* 432 S.W.2d 245, 254 (Mo.1968); *In re J. L. L.,* 402 S.W.2d 629, 633–4 (Mo.App.1966).

■ The court in his memorandum opinion incorrectly found that the divorce decree had given Christine primary custody and that Christine had voluntarily surrendered custody of young John to his father after the divorce. The fact was that the decree had given primary custody to the father and she surrendered the child to him

in obedience to the decree. This occurred within days after the decree was granted in December, 1971. This fact does not loom large in the total picture. Had the trial court correctly found the fact, there would remain sufficient and substantial evidence to support the court's judgment and we do not believe that the fact, incorrectly found by the court, played any decisive role in the decision.

The judgment of the trial court is affirmed.

All concur.