**In re ADOPTION OF K. L. G. and S. D. G., Minors,**

**J. E. G. and I. I. G., Petitioners-Appellants,**

**K. I. S., Natural Mother, Appellant,**

**D. F. and B. F., Petitioners-Respondents.**

**Nos. 12270, 12271.**

Missouri Court of Appeals, Southern District, Division Two.

Aug. 30, 1982.

Motion for Rehearing and to Transfer to Supreme Court Denied Sept. 15, 1982.

Sandra K. Skinner, Fiedler, Jones, Conklin & Skinner, Springfield, for appellant.

Charles A. Moon, Springfield, for petitioners-appellants.

Ivella McWorter Elsey, Robert M. Sweere, Springfield, for petitioners-respondents.

MAUS, Chief Judge.

This action was commenced by the maternal grandparents' petition for adoption of one of three illegitimate children born to their daughter. The daughter consented to that adoption. That petition was amended to seek the adoption of all three children. Initially the amended petition alleged the mother had abandoned the two children added in the amended petition. Later the daughter consented to their adoption of those two children. The latter two children were in the custody of foster parents. The foster parents were permitted to intervene in the pending action. In that action they filed their petition to adopt the latter two children alleging their mother had abandoned and neglected them for more than one year before the filing thereof. A separate hearing was held in regard to the grandparents' adoption of the child named in the original petition. That adoption was granted as prayed. Thereafter, an extended hearing was held concerning the adoption of the other two children. The grandparents, the foster parents and the mother fully participated in that hearing and presented and cross-examined witnesses.

The trial court entered a judgment denying the petition of the grandparents and granting the adoption prayed by the foster parents. The grandparents and mother appeal, each presenting in substance the same two points of alleged error.

The first point is that the trial court erred in permitting the foster parents to intervene and file their petition for adoption. They contend that such action is prohibited by *Matter of Trapp*, 593 S.W.2d 193 (Mo. banc 1980). *Trapp* did condemn intervention by foster parents who desired to adopt one of the children, the subject of that proceeding. In reaching that result the court observed the foster parents did not have a legal interest entitling them to intervene as a matter of right under Rule 52.12(a)(2). It further concluded § 452.485 was not applicable. However, *Trapp* was a

custody proceeding under Chapter 211. The sole issue was the fitness of the natural parents to have custody of their children returned to them.

*Trapp* has been construed "to be limited in scope and application to those cases involving foster parents as parties in proceedings pursuant to Chapter 211." *Frederick v. Frederick*, 617 S.W.2d 629, 631 (Mo.App. 1981). Upon this basis, supported by the compelling reasons for permitting intervention in adoption hereafter discussed, *Trapp* does not establish the action of the trial court was prejudicially erroneous.

■ The appellants then argue the reasoning of *Trapp* declares the intervention was erroneous because it injected into an adoption based upon neglect or abandonment the issue of fitness of the foster parents. In effect they argue that in any adoption based upon neglect or abandonment there must be a bifurcated hearing. It is true in granting such an adoption the evidence must establish and the court must determine the neglect or abandonment without consideration of fitness of the adoptive parents. *Adoption of R. A. B. v. R. A. B.*, 562 S.W.2d 356 (Mo. banc 1978). This determination has been made in countless cases without a bifurcated hearing. If appropriate, the trial court may in its discretion order a separate hearing of any issue. Rule 66.02. No rule or statute requires a bifurcated hearing. The absence of such a rule or statute is an expression of confidence in the courts to accurately analyze the evidence in respect to the two issues.

■ Again relying upon *Trapp*, the appellants' basic position is that no one should have been permitted to participate in the hearing upon the grandparents' petition except the petitioners, the mother and the guardian ad litem. This position is unsound. Historically, in proceedings involving the welfare of children, the courts have utilized various procedures to make available to the court all sources of information.[1]

---

1. It has been held that foster parents "because of their relationship with or particular knowl-

edge concerning the child, can materially aid the court in its determination of what in fact is

For example, the appearance and participation of a grandparent as "an informant" was approved in *In re J.____ L.____ H.____,* 373 S.W.2d 635 (Mo.App.1964). Where there are two sets of petitioning adoptive parents, if the court did not permit each set to participate in the hearing upon each petition it could lose an advantage of a means of eliciting full and accurate information pertaining to the welfare of the child or children. The advantage to the court and to the children of investigation, presentation of evidence and cross-examination by an adversary is dramatically demonstrated in this case by a comparison of the information developed upon the hearing concerning the older child involving only the petitioners and mother and that concerning the two younger children involving in addition the foster parents. *Trapp* may establish foster parents have no legal interest to intervene as a matter of right. However, contrary to some decisions, *Petition of Benavidez,* 52 Ill.App.3d 626, 10 Ill.Dec. 362, 367 N.E.2d 971 (1977), the claim of the first petitioning adoptive grandparents does have a question of law or fact in common with the claim of the intervening adoptive foster parents. "In both the primary issue is the welfare of the identical child." *State ex rel. Earnest v. Meriwether,* 270 S.W.2d 20, 22 (Mo. banc 1954). It is difficult to discern how a court can determine an adoption by one set of adoptive parents is in the best interests of a child without a comparison of the fitness of each of the sets of adoptive parents. With such a basis, it has been held that intervention in an adoption case may be permitted. *Thelen v. Ekberg,* 237 Mo.App. 258, 167

S.W.2d 645 (1943).[2] Or, if two petitions for adoption are filed in the same court, the consolidation of those actions has been approved. *In re J.____ L.____ H.____, supra.*[3] Also see *In re Mayernik,* 292 S.W.2d 562 (Mo.1956) and *State ex rel. Earnest v. Meriwether, supra.* The approval of consolidation is recognition of a question of law or fact common to the two actions. Rule 66.-01(b). The interdependence of such actions is demonstrated by the following: "We are convinced that respondent judge did not err in holding that the petitions were in effect but one action and in further holding that, after being disqualified to hear and determine the second petition, he was also disqualified to hear and determine the first." *State ex rel. Earnest v. Meriwether, supra,* at p. 23. The trial court did not err in permitting the foster parents to intervene.

■ The appellants both contend the evidence is insufficient to support the determination the mother, for more than one year before the filing of the foster parents' petition, abandoned and neglected the children within the meaning of § 453.040. The amended petition of the grandparents praying for the adoption of the two younger children was filed September 25, 1979. The petition of the foster parents was filed February 22, 1980. The mother first contends the one year period must be that preceding the filing of the amended petition of the grandparents. This contention is unsound. The clear implication of the statute is that it is the year preceding the filing of the petition under which adoption is to be decreed. *Matter of Adoption of Pearson,* 612

in the child's best interest" should be permitted to intervene as a matter of right. People in *Interest of M. D. C. M.,* 522 P.2d 1234, 1236 (Colo.App.1974). For a similar holding concerning grandparents see *In re Welfare of Schulz,* 17 Wash.App. 134, 561 P.2d 1122 (1977).

2. Rule 52.12. For an excellent discussion of the efforts of grandparents to intervene first merely opposing adoption by the other grandparent and then by cross-petition seeking adoption by the intervenors see *In re Drew,* 637 S.W.2d 772 (Mo.App.1982).

3. Rule 66.01(b) dealing with consolidation of actions involving a common question of law or fact in part provides "it may order all the civil actions consolidated." Whether or not an order of consolidation under a similar federal rule converts the actions into one action in which a single judgment is rendered, which points up the possible desirability of cross-intervention, is discussed in Wright & Miller, 9 Federal Practice and Procedure: § 2382. Also see 1 Am. Jur.2d Actions § 161 (1962). It has been held in Missouri that separate adoption actions may be made one action. *State ex rel. Earnest v. Meriwether,* 270 S.W.2d 20 (Mo. banc 1954).

S.W.2d 30 (Mo.App.1981); *In re Adoption of S.,* 581 S.W.2d 113 (Mo.App.1979). In any event, this is not a decisive issue because, as hereinafter demonstrated, the evidence establishes an abandonment in respect to both periods. *In re Adoption of S.,* supra.

■ The mother's argument would also focus the attention of this court upon her conduct during the one year period. However, the key element in the definition of abandonment or neglect is the intent of the non-consenting parent. Intent may be, and usually must be, determined from the actions of that parent. *Young v. Young,* 588 S.W.2d 207 (Mo.App.1979). Her conduct before and after the critical year is to be considered in determining her intent as demonstrated by her actions in the critical year. *D____ G____ K____ v. D____ G____ K____,* 545 S.W.2d 81 (Mo.App.1976).

In considering this point, this court must give due regard to the opportunity of the trial court to judge the credibility of the witnesses, Rule 73.01(c)(2), and to reject the testimony of any witness. *Estate of Sheets v. Sheets,* 558 S.W.2d 291 (Mo.App.1977). In reviewing the evidence, all fact issues upon which no specific findings were made shall be considered as having been found in accordance with the result reached. Rule 73.01(a)(2). When the record is reviewed in accordance with those principles, the following is an outline of the evidence supporting the judgment of the trial court.

At a time not clear from the record the mother was married to and divorced from one C. S. He was not the father of any of her three illegitimate children who were born on the following dates. B. J. (male) on February 23, 1971; K. L. (female) on April 13, 1972; and S. D. (female) on April 1, 1975. These children were reported to have different fathers. According to a record in evidence, the mother had an abortion in 1979. At the time of the birth of the first child in 1971 the mother was 16 years old. While the record concerning her residence is vague, as it is in many other respects, except for the sojourns noted herein the mother lived in the home of her parents. After their birth, each of the children was taken to that home. However, K. L. had a brief stay in a foster home before the grandparents were willing to accept her in the home. S. D. was briefly in a foster home before she was delivered to her mother who was then living with a friend "Truck". The whereabouts of the other children at this time is not clear. After about two months the mother, with S. D., returned to her parents' home. When the children were in that home they were primarily cared for by the grandmother, although the grandfather said the mother did pretty close to her share.

On May 12, 1976, through some unexplained circumstances the mother left the two younger children with one R. W. and was seen boarding a bus. When the mother had not returned two days later, R. W. took the children, dirty and suffering from colds, to Family Services. A neglect petition was filed. Following a conference, the children were returned to the mother with the understanding they would live with her parents and she would cooperate in a plan for improvement in her style of living.

Nevertheless, in that summer the mother, with the two smaller children, moved to undescribed living quarters at a separate address. At least at times the older child was also there. It was at this address the social workers found: the four-year-old girl at home by herself; the mother there with six men; and the mother asleep at 2:00 p.m. with the children unattended. During this period a social worker discussed with the mother her abuse of alcohol and drugs. It was at this address, when it was suggested she get up earlier to get the older child to school on time, the mother replied, "I'm not going to get up for some stinking ass school." It was from this address a neighbor took S. D. to the hospital suffering from a high fever. The grandparents got the children at the hospital. There was another conference with the authorities. As a result, the grandmother was to have primary responsibility for the children and the mother was not to take them from that home.

Apparently, the mother and children then remained in the grandparents' home until September 12, 1977. However, during that time the mother spent ninety days in jail and approximately two weeks in a mental hospital. After having a weekend pass, the mother failed to return to that hospital for recommended further treatment. On September 11, 1977, the grandmother entered the hospital. The following day the mother took the children to the home of their great grandmother, who was in excess of 80 years of age, and left them. The authorities were informed of their whereabouts and took them into custody on September 13, 1977. The social worker noted the presence, in the house of the grandmother, of a 40-year-old alcoholic who had passed out. The children had not eaten and were dirty. After a period in which the two younger children were in foster care, arrangements were made for the youngest to be in the care of the mother's aunt and uncle in a nearby community. The other was returned to the mother who had returned to her parents' home. However, in a few days the mother took that child to the aunt and uncle. The mother left for New York where she was to participate in a program of four months duration in a Christian Home for Girls. The mother returned in four or five days.

The two younger children remained in the care of the aunt and uncle until May 22, 1979. During this period the mother visited with those children when she accompanied her parents to that home or when they were in the parents' home for a visit. The frequency of this visitation is vague, estimates ranging from once a week to twice a month. For two months of the period the record indicates the mother was in a detoxification center for alcohol and drug abusers. There was evidence the mother did not visit the children from Christmas until March 30, 1979. On the latter day the grandparents and mother picked up the children. However, that evening the children were left with a baby sitter in the home of a friend of the mother. After calls by the children to the aunt, the grandparents got them at about 2:30 a. m.

The aunt and uncle, who were in their 60's, stated to Family Services that they could no longer care for the two younger children. Thereafter, even though the aunt and uncle relented, on May 22, 1979, those children were placed in the custody of the petitioning foster parents where they were at the time of trial on March 25, 1981.

After the children were placed with the foster parents, visitation was to be arranged through Family Services. Five or six appointments were made for visitations by the mother. She failed to keep two of those appointments. On September 3, 1979, the mother disappeared from her parents' home. She said she did so because of a warrant for her arrest. Her whereabouts were unknown until the latter part of November, 1979, when she contacted her parents for money to return to Springfield. The mother was in Detroit living with one R. S. She returned to Springfield on December 3, 1979, where she was arrested. She has been in jail or prison since that time.

Even though appropriate agencies determined the mother had employable skills, her employment history is notably brief. Her father thought she had worked in records at the courthouse and at a restaurant. However, the mother gave as her employment history two months work at a restaurant. She made no reference to any effort on her part to find other employment.

On the other hand, her involvement with various social agencies was of long duration and extensive. It was shown to have commenced with the birth of her second child. It includes at least two agencies seeking to help her in obtaining gainful employment. For a period of time not clear from the record she received aid to the Families of Dependent Children. She was continually counseled by her parole officer, mental health services, and Family Services seeking to motivate her to improve her lifestyle. The counseling included programs by which she could regain custody of her children. It is not necessary to further lengthen this unduly long opinion by reciting the results of these efforts. It is sufficient to note

each resulted in a series of appointments unkept by the mother. One chart shows that between October 18, 1978, to May 21, 1979, twenty appointments were made for counseling and one for visitation. She kept one counseling appointment. Her actions not only clearly established her total failure to help herself, but extended to threats against those seeking to help her. Her history of broken appointments is far worse than that condemned in *T. H. v. Ambelang,* 497 S.W.2d 210 (Mo.App.1973).

While it demonstrates a lengthy history of the mother's violation of the laws, the record is vague concerning the details thereof. It includes the following references. She had some involvement with the juvenile authorities before she quit school at the age of sixteen years. In May, 1975, she was on probation, one condition of which was that she live with her parents. In May, 1977, a social worker discussed with her plans upon her release from jail. Starting in September, 1977, she served three months for forgery. Upon her return to Springfield on December 3, 1979, she was arrested. She admitted to having been in federal penitentiaries in Ft. Worth, Texas, and Lexington, Kentucky, on charges of forgery. At the time of the trial she was confined in a Missouri penitentiary.

■ The term "abandoned" as used in § 453.040 has been defined to be:

[F]irst, a voluntary and intentional relinquishment of the custody of the child to another with the intent to never again claim the rights of a parent or perform the duties of a parent; or second, an intentional withholding from the child, without just cause or excuse, by the par-

ent, of his presence, his care, his love, and his protection, maintenance, and the opportunity for the display of filial affection. *S. C. H. v. C. W. H.,* 587 S.W.2d 945, 947 (Mo.App.1979).

The authorities establish that to meet the requirements of that definition "the conduct of the parent must evidence an intent or mental attitude to forsake the status of a parent—at least for the period of time declared in the statute." *Adoption of R. A. B. v. R. A. B.,* supra, at p. 358.

The critical period for determining if the conduct of the mother demonstrates abandonment of the two younger children is from February 22, 1979, to February 22, 1980. Or, if the period contended for by the mother is considered from September 12, 1978, to September 12, 1979. During the initial part of the period those children were in the custody of the aunt and uncle. During the latter part, they were in the custody of the foster parents. Such circumstances do limit the manner in which the mother as a non-custodial parent could demonstrate an intent not to forsake the status of a parent. However, they do not justify a failure to make a reasonable effort to fulfill her parental responsibilities. The situation is similar to a child being in the custody of one parent whose marriage to the other parent has been dissolved. Compare *Young v. Young,* supra. The duty of a parent whose children are in foster care has been carefully analyzed by the Supreme Court of Pennsylvania.[4]

■ From a review of the facts, it is apparent these children during the critical period were in the custody of others because of the mother's complete refusal to

4. "Despite appellant's hostile reaction to having her children placed in foster care, after the placement she was content to allow others to provide for their care and support, while she pursued goals and activities on her own. Appellant's passive interest in their well being did not satisfy the children's continuing needs for responsible parental care. Her conduct did not satisfy her affirmative duty to utilize all available resources to preserve her parental rights. *In re Burns,* 379 A.2d 535, 540 (Pa.1977). "We have held that parental rights may not be preserved by 'waiting for some more suitable fi-

nancial circumstance or convenient time for the performance of parental duties and responsibilities (while others adequately provide the child with [his or] her immediate and continuing physical and emotional needs).' ... Parental duty does not require the impossible, but may encompass that which is difficult and demanding. A parent may not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *In re Burns,* supra, at p. 541.

assume any degree of parental responsibility. From their birth, she had demonstrated utter disregard for their welfare. Under these circumstances it is particularly appropriate that her prior actions be considered in determining her intent as manifested by her conduct during the critical period. Of great significance is the statement of the mother that when she took the youngest child there she intended to leave the children with her aunt and uncle for all time. The testimony of the grandparents attempting to show the daughter did not abandon those children was seriously impeached if not destroyed by their affidavit she had abandoned those children for one year before they filed their amended petition.

■ A parent who has abandoned a child may repent of that abandonment. However, the effectiveness of a professed repentance is to be determined by an actual or attempted exercise of parental rights *and the performance of parental duties.* (Emphasis added) *T. H. v. Ambelang,* supra. If the conduct of the mother in the critical period was not to demonstrate her abandonment of those children, circumstances demanded that she do something to develop her ability to perform her parental duties. She exerted no effort to do so. Instead she continued in the lifestyle that demonstrated her lack of concern for those children. She did not even avail herself of arrangements others made for her to maintain contact with those children.

■ In determining the sufficiency of the evidence, this court must consider a point that neither party has briefed. That point is the effect of the imprisonment of the mother during the last three months of the critical period. Missouri's prior adoption code provided no consent was required of a parent imprisoned under a sentence that would not expire until two years after the filing of the petition. § 9609, RSMo 1939. The present code contains no reference to the subject. Research has revealed no case under the present code dealing with the imprisonment of a non-consenting parent. It is generally held that

such imprisonment does not per se constitute abandonment. *Murphy v. Vanderver,* 169 Ind.App. 528, 349 N.E.2d 202 (1976). On the other hand, a majority of the decisions hold that under appropriate circumstances imprisonment may constitute abandonment. See Annot., Adoption—Consent of Confined Parent, 78 A.L.R.3d 712 (1977). It has been said: "It is our opinion that continued intentional criminal misconduct with knowledge that the probable result will be separation from and inability to fulfill parental duties is material evidence to be considered in determining an intent and purpose to abandon." *Thomas v. Culpepper,* 356 So.2d 656, 658 (Ala.1978). Further examination of the cases is not necessary. It is sufficient for this case to hold that where a parent has embarked upon a course of conduct amounting to abandonment that parent's imprisonment as a result of a volitional criminal act, which is a repetitive act, continues that abandonment. *In re Adoption of Dobbs,* 12 Wash.App. 676, 531 P.2d 303 (1975). Also see a very similar case, *State ex rel. Juv. Dept. of Multnomah Co. v. Patton,* 5 Or.App. 450, 485 P.2d 653 (1971).

The mother contends she did not abandon the children because she visited them and at times took them clothing and gifts. Her limited visitation has been noted. In making this contention the mother emphasizes that by those acts she exercised her rights as a parent. Many judicial expressions dealing with abandonment make reference to parental rights and claims. However, a thorough review of the cases reveals that the status of a parent is fundamentally based upon the assumption or at least a reasonable effort to assume parental responsibility and the performance or at least a reasonable effort to perform parental duties. *In re Adoption of S.,* supra. Casual visits and occasional gifts are not sufficient. *Matter of Adoption of G____,* 618 S.W.2d 462 (Mo.App.1981); *D. A. Z. v. M. E. T.,* 575 S.W.2d 243 (Mo.App.1978); *Matter of Adoption of Fuller,* 544 S.W.2d 345 (Mo. App.1976). As so ably stated by Judge Wasserstrom: "A parent should not be able

to treat a child as a plaything to pick up for sporadic enjoyment at his whim, while at the same time disclaiming the burdens, sacrifices, and oft times pains of nurturing and caring for the child." *In re Adoption of S.,* supra, at p. 116. There is overwhelming evidence to support the trial court's determination of abandonment. Under such circumstances it is not necessary to deal with the issue of neglect.

■ The last point is the grandparents' contention there was no evidence to support the trial court's determination it was not in the best interests of those children to decree their adoption by the grandparents. They principally rely upon the fact the trial court decreed their adoption of the oldest child. This reliance is without foundation. It is sufficient to note the evidence before the court in decreeing that adoption did not include the evidence adduced in the trial in which the foster parents participated. Further, the circumstances of the children were remarkably different. There was before the court the statement of the mother she consented to their adoption by the grandparents until she was released and her intention in doing so was "so I could take over responsibility and custody of my children once I am released." She said she changed that intent, but the trial court was not compelled to accept that retraction. This prospect by itself is sufficient to support the determination in question. An example of additional supporting evidence is the fact the grandparents had knowledge of the deplorable living conditions of those children when their mother lived out of their home and they made no attempt to correct the situation.

As no contention is made otherwise, the evidence that established the fitness of the foster parents need not be detailed. They were of suitable age and background. Both had been employed at responsible jobs, although the foster mother reduced her employment to a part-time basis to devote her time to the children. The record demonstrates that in the twenty months the children were in their custody, with skill and love, they provided for them a superior home and environment. The judgment is affirmed.

PREWITT, P. J., and HOGAN and BILLINGS, JJ., concur.