**In the Interest of A.R.M.**

No. 52457.

Missouri Court of Appeals,
Eastern District,
En Banc.

March 15, 1988.

Motion for Rehearing and/or Transfer
to Supreme Court Denied
April 20, 1988.

Application to Transfer Denied
June 14, 1988.

James L. Rohlfing, St. Louis, for appellant.

Dewey S. Godfrey, Jr., St. Louis, for respondent.

CRANDALL, Judge.

The general issue to be decided in this appeal is whether the trial court erred in granting the adoption of A.R.M., a nine year old female, by her maternal grandmother (petitioner) over the objection of the natural father (father). The specific questions presented are whether father abandoned A.R.M. and whether the adoption is in the best interests of the child. Finding no abuse of discretion, we affirm.

Preliminarily, we note that it is the prerogative of the trial court to determine the credibility of witnesses and to resolve conflicts in the evidence. We, as an appellate court, review the facts and the reasonable inferences therefrom, in the light most favorable to the trial court's order. *In the Interest of R.H.S.*, 737 S.W.2d 227, 236 (Mo.App.1987). With those precepts firmly in mind, we now review the record.

A.R.M. was born on June 4, 1978. She lived with her father and mother in an apartment which was located above the apartment in which her paternal grandparents lived. Her paternal grandmother frequently baby-sat with her.

A.R.M. was approximately three and one half years of age when her father murdered her mother. Father was tried and convicted of murder in the second degree and sentenced to 40 years' imprisonment. This court reversed that conviction and remanded for a new trial. After a second trial, father was again convicted of murder in the second degree and sentenced to 20 years' imprisonment. This court affirmed the second conviction and we adopt the following facts from the opinion rendered in that case: [1]

[Father] and the victim, [mother], were married in February, 1977. On Friday, August 21, 1981, [mother] left the apartment she shared with [father], taking their daughter with her, and moved in with her mother, [petitioner].

[Father] was extremely upset that [mother] had moved out of their apartment. He spent the weekend outside [petitioner's] house trying to persuade [mother] to return. On Saturday, at 3:30 a.m., [mother's] sister noticed [father] waiting outside the house and, at his insistence, took him upstairs to see [mother]. [Mother] refused to see him and told him to get out. [Father], at first, refused to leave but finally left at [petitioner's] insistence. On Sunday morning, [father] appeared again and began shouting for his daughter. After a period of time, [petitioner] came out, and [father] told her 'everyone was against him' and, if [mother] didn't come back to him, he would blow up [petitioner's] house.

On Monday, August 24, [mother] filed for an order of protection, and, while in the courtroom, [father] followed [mother] as she repeatedly changed her seating. After the order of protection was issued, [mother], afraid to return to her car alone, was accompanied by a deputy sheriff. When they reached her car, they discovered the spark plugs had been disconnected; a deed [father] admitted he committed.

[Father] also repeatedly threatened to kill [mother]. On the same Monday, [father] told a friend of his he could not stand losing [mother] and he would kill her, then take an 'overdose' to avoid the consequences. Also, on that Monday and on the next day, [father's sister] overheard [father] tell [mother] by phone that if she did not come back to him, he would kill her and himself. Then, on Wednesday morning, August 26, 1981, the day of [mother's] death, [father] and [mother] were seen and heard arguing in front of [mother's] place of work. [Father] was overheard to say, 'if I can't have you, nobody else will. You will be one dead m___ f___.'

Around noon, on Wednesday, [father's sister] saw [mother] leaving work. [Father] followed [mother] in his car. At that time, [father's sister] was leaving work with a [co-worker] to eat lunch.

---

1. In the adoption proceeding, the trial court took judicial notice of the court file in the father's criminal case which included the opinion of this court affirming father's conviction. We quote from that opinion without citation, in order to preserve the anonymity of A.R.M.

She felt ill, however, and [a co-worker] drove [father's sister] to her apartment, which is in the same building and directly below [father's] apartment. When they reached [father's sister's] apartment, [a co-worker] and [father's sister] saw the cars of [father] and [mother] parked outside.

After entering her apartment, [father's sister] went to lie down. When she reached her bedroom, she heard some moaning and the sound of [mother's] voice saying, 'I love you,' coming from the upstairs apartment. [Father's sister] sensed something was wrong and called [father] on the phone. [Father] answered and told [father's sister] to come up and see what was wrong for herself.

[Father's sister] and [a co-worker] went upstairs. They proceeded to the back bedroom and discovered [mother] lying across the bed with a stab wound in her stomach. [Mother's] brassiere and blouse were pulled up over her breasts and her pants were pulled down to her ankles. [Father] stood near the bed with two knives in his hands, a large kitchen knife and a smaller steak knife. [Father] said he was not going to jail for murder and he was going to kill himself. He then fled with the knives. [Mother] died enroute to the hospital. Subsequently, [father] was apprehended by police in Greenville, Indiana.

At the second trial, father testified that mother unexpectedly appeared at his apartment to get baby clothes. He said that mother went into the child's bedroom, pulled a large kitchen knife from her purse and assaulted him. A struggle ensued and mother fell on top of the knife. He picked mother up, placed her on the bed and pulled her blouse up and pants down to see where she was injured.

In considering father's testimony at his second criminal trial, this court opined:

[Father's] urged theory is not only unreasonable, it borders on the bizarre. After [father's] consistently repeated threats to kill [mother], [father] would have a reasonable person believe [mother] came to his apartment, alone, proceeded to assault him with a knife and then conveniently fell on the knife.

More important, the operative facts, if viewed rationally, are inconsistent with [father's] proffered theory of innocence.

Father also pleaded guilty to the crime of possession of a controlled substance and was sentenced to a concurrent two year term. That possession conviction resulted from a crime he had committed while on bond between the two murder trials. He admitted using illegal drugs both in and out of the penitentiary.

Father sired twins while on bond between the murder convictions. Later, during his incarceration, he married the twins' mother. She is currently unemployed and supports the twins, along with another son, from ADC (Aid to Dependent Children) payments. The father has expressed a desire that either his current wife or his mother (the paternal grandmother) adopt A.R.M.

Petitioner is a married woman in her late forties. She has had custody of A.R.M. since the murder. On November 17, 1981, the trial court granted petitioner legal and actual custody of A.R.M. Petitioner filed a petition for transfer of custody and adoption on January 6, 1983, alleging that father had willfully abandoned A.R.M. for at least one year prior to the filing of the petition. At two adoption hearings, one held in October 1983 and another in May 1986, there was evidence that, since November 1981, father had sent only a few letters and cards to A.R.M. He had sent no gifts, with the exception of a Christmas gift furnished to him by a charitable organization. He had sent no money, despite the fact that he was presently earning a minimal income while incarcerated and had previously earned an income while out on bond.

Section 453.040(5) RSMo (1986), which took effect after August 13, 1982, requires a period of at least six months' abandonment for a child one year of age or older. That statute provides that consent for adoption by a natural parent is not required where a parent abandons a child for six months or willfully, substantially and

continuously neglects a child for that period of time. In the present case, the trial court found abandonment, not neglect. We first focus on the issue of whether there was substantial evidence to support the trial court's finding that father abandoned A.R.M.

■ Adoption proceedings are statutory. *See* Sections 453.055—.503 RSMo (1986). Adoption statutes are strictly construed in favor of the natural parents. *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455 (Mo. banc 1984). A court may grant an adoption without parental consent upon finding willful abandonment by a parent for the six months immediately preceding the filing of the petition. Section 453.040(5) RSMo (1986).

■ Abandonment is the voluntary and intentional relinquishment of custody with the intent to never again claim any rights or duties of a parent. *In re Adoption of Baby Boy W.*, 701 S.W.2d 534, 543 (Mo. App.1985). Abandonment must be established by clear, cogent and convincing evidence that instantly tilts the scales in the affirmative when weighed against opposing evidence. *In the Interest of J.A.J.*, 652 S.W.2d 745, 748 (Mo.App.1983).

■ Each adoption must be judged on its own unique set of facts. *In re the Adoption of M.D.L.*, 682 S.W.2d 886, 888 (Mo. App.1984). Imprisonment of a parent does not per se constitute abandonment. *In re Adoption of K.L.G.*, 639 S.W.2d 619, 626 (Mo.App.1982). "On the other hand, a majority of the decisions hold that under appropriate circumstances imprisonment may constitute abandonment." *Id.; see also Adoption of M.D.L.*, 682 S.W.2d at 889.[2]

■ In the instant case, father intentionally murdered his wife, A.R.M.'s mother, and fled from the state immediately thereafter. He was subsequently convicted of that murder and of possession of a controlled substance. He admitted his use of drugs both in and out of the penitentiary. He is presently imprisoned for a term of twenty years.

Although father's incarceration is not per se determinative of his abandonment of A.R.M., the nature of the crime father committed to warrant such incarceration was a relevant factor for the juvenile court to consider. *In Interest of Baby Girl W.*, 728 S.W.2d 545 (Mo.App.1987) involved the termination of the parental rights of a young father who was incarcerated as a result of a probation revocation for a burglary and stealing conviction when he was 17 years old. The termination of his parental rights granted by the trial court was reversed on appeal because "[t]here never was any recognition of even an ultimate prospect to reconcile father and daughter, only a studied purpose to consummate the adoption." *Id.* at 549.

*Baby Girl W.*, however, is factually inapposite to the present case. Here, the child's father was sentenced for the murder of A.R.M.'s mother. In contrast to the crime committed by the father in *Baby Girl W.*, the nature of the crime itself in the present action, i.e., the intentional murder of one parent by another, resulted in the disintegration of the family unit and left the child without even a modicum of parental nurturing during the incarceration of the remaining parent.

It is difficult to conceive of a more calamitous event for a child than the murder of her mother by her father. It is absurd for the perpetrator of such a vile act to argue that he should retain his parental

---

**2.** The present termination of parental rights statute Section 211.447.3(6) RSMo (1986) was not in effect at the time this case was tried. It provides in pertinent part that, when considering whether to terminate the parent-child relationship because of, *inter alia*, abandonment:

3. [T]he court shall evaluate and make findings on the following factors, when appropriate and applicable to the case:

\* \* \* \* \* \*

(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights....

This particular legislative enactment does not represent a change in the law, but simply reflects a legislative recognition of existing case law.

rights concerning that child. We can presume that father knew of the probable devastating effect of his actions on A.R.M. and of the inevitable lengthy separation from her as a consequence of his incarceration. The crime itself creates an irreparable emotional estrangement of the child from the father. His lengthy sentence will result in a physical separation during all of A.R.M.'s formative years. There is not a scintilla of hope that he could actually resume his parental responsibilities.

In addition, the critical period for determining if the conduct of father demonstrated abandonment of A.R.M. is six months prior to January 6, 1983, the date on which petitioner filed the petition of adoption. Petitioner has had legal and actual custody of A.R.M. since November 1981. Since that time, father has maintained only sporadic communication with A.R.M. by way of cards and letters. These attempts at correspondence, at best, constitute merely token efforts to preserve the parent-child relationship. Admittedly, father has limited resources available to him during his incarceration; but he has made no contribution in any form to the support of A.R.M. He has sent no gifts or money. He went to prison without making any provision for the support of A.R.M. during his term of imprisonment. He also has indicated his willingness to voluntarily relinquish his parental rights relative to A.R.M. should the court permit him to choose A.R.M.'s new parent. By word and by deed father has demonstrated his desire to sever all parental relationship with A.R.M.

■ There is evidence in the record which indicates that, after the murder of A.R.M.'s mother, petitioner prevented contact between father and A.R.M. and between father's family and A.R.M. There is also evidence in the record that father attempted to maintain more than token contact with his child, albeit not pecuniary.[3] We concede that petitioner may not create the grounds for a nonconsensual adoption.

Had the facts supported such an occurrence, it would have been improper for petitioner to prevent father from communicating with A.R.M. and then to claim that father's lack of communication established abandonment.

Two things are noteworthy regarding that evidence. First, that evidence was not evidence proffered by petitioner, but came from father's evidence or cross-examination of witnesses by father's counsel. We assume that the trial court resolved any conflicts in the evidence favorably to petitioner, not to father. It is not our function, as an appellate court, to try the case de novo. *See* Rule 73.01(c).

■ Secondly, a multiplicity of factors directly attributable to father constituted the abandonment. Even if petitioner prevented A.R.M.'s contact with father or with father's family, that issue is irrelevant in this case to the question of abandonment. We would not be surprised if the relationship between petitioner and father and his family is less than cordial. In view of the circumstances, it would not be unusual if petitioner did not encourage this child of tender years to maintain a relationship with the murderer of her mother or from an association with that murderer's family.

The father destroyed the bond of parent and child. In so doing, he abandoned his child by intentionally, without just cause or excuse, withholding from his daughter his presence, care, protection, maintenance and the realistic opportunity for love and filial affection. *In re Adoption of K.L.G.*, 639 S.W.2d 619, 625 (Mo.App.1982). The record is replete with substantial evidence to support the trial court's finding of abandonment. Clearly, there was no abuse of discretion.

■ We next address the issue of whether petitioner's adoption of A.R.M. would be in the best interests of the child. Petitioner has, in effect, been the sole parent for

---

**3.** Lack of payment by a parent for the cost and maintenance of a child, when financially able to do so, is a factor to be considered by the trial court in deciding to terminate parents rights based on abandonment as well as neglect. Section 211.447.3(3). Again, this reflects a legislative recognition of existing case law. *See, e.g., In the Interest of J.H.H. v. J.D.*, 662 S.W.2d 893 (Mo.App.1983).

the child since A.R.M. was approximately three and one half years of age. Petitioner is married and is able to provide a positive home environment for A.R.M. The child is in good health, is well cared for, and is an "A" and "B" student at the neighborhood parochial school which she attends.

Our review of the record convinces us that the finding by the trial court that an adoption by petitioner would be in the best interests of A.R.M. was not an abuse of discretion. This litigation should come to an end. A.R.M. should be permitted to go on with her life in a loving and nurturing environment, an environment which perhaps will allow her to partially heal from the terrible harm which her father has inflicted on her.

The judgment of the trial court is affirmed.[4]

DOWD, SMITH, KELLY, REINHARD, STEPHAN, CRIST, SIMON, CARL R. GAERTNER, and GARY M. GAERTNER, JJ., concur.

SATZ, C.J., and GRIMM, J., concur in result only.

KAROHL, J., dissents in separate opinion.

PUDLOWSKI, J., concurs in dissent.

KAROHL, Judge, dissenting.

In essence the majority opinion holds that petitioner, maternal grandmother, who by her own evidence entirely foreclosed any contact by the natural father can invoke the jurisdiction of the Juvenile Court to obtain an adoption by claiming the natural father abandoned the child as that term is used in Section 453.040 RSMo 1986. That section requires a preliminary finding that the father expressly consented, neglected or abandoned the child. Such finding is jurisdictional and must be proved before reaching a question of the child's welfare. *Matter of Adoption of Richards,*

624 S.W.2d 483, 485 (Mo.App.1981). All of the evidence in the present case indicates that petitioner willfully and intentionally prevented any contact between the natural father and his family with the child after November 17, 1981. Accordingly, no question of credibility of any witness is involved. By her actions petitioner is not qualified to invoke the jurisdiction of the adoption court on the claim of abandonment and that issue is determinative that the trial court erred as a matter of law in permitting this petitioner to adopt A.R.M.

We first dispose of the underlying legislative decision that the natural father abandoned his child solely by the act of taking the life of the natural mother. The legislature has not seen fit to make that an absolute ground of abandonment. It is inappropriate for a judicial opinion to do so. First, adoption exists as a creature of statute and such statutes are strictly construed in favor of the natural parents. *In re Adoption of W.B.L.,* 681 S.W.2d 452, 455 (Mo. banc 1984). A court should not legislate but the majority opinion does precisely that. The majority opinion substitutes a single-act theory for a willful estrangement over a period of time, six months by the present statute. Second, abandonment must be willful. Section 453.040 RSMo 1986. Where this petitioner, by all of the evidence presented to the juvenile court, willfully and intentionally foreclosed any contact between the natural father and the child his intent cannot become willful abandonment for this petitioner. The central focus is on the intent of the parent to be gleaned from the surrounding circumstances. *Matter of Adoption of Richards,* 624 S.W.2d 483, 485 (Mo.App.1981). Further, abandonment is the voluntary and intentional relinquishment of custody with the intent to never again claim any rights or duties of a parent, and may occur when a parent intentionally and without just cause withholds love and affection from his child. *In re Adoption of Baby Boy W.,* 701 S.W.

4. In view of the statement in the dissenting opinion that the majority opinion is in conflict with previous opinions of the Missouri Supreme Court and other courts of appeal, we would point out that this case was certified to the Supreme Court by the dissenting judges pursuant to Rule 83.01. The Supreme Court then entered the following order: "Failing to perceive the conflict of cases suggested by the certifying judge, the Court orders this case retransferred to the Missouri Court of Appeals—Eastern District." In the Interest of A.R.M., No. 70262, Order (Mo. banc March 3, 1988).

2d 534, 543 (Mo.App.1985). Third, this petitioner did not plead that the act of killing the natural mother was abandonment and the opinion of the majority determines an issue that was not pleaded or tried by the parties. Fourth, the decree of adoption found willful abandonment during the critical six month period when this petitioner, by her own testimony and all of the evidence, affirmatively foreclosed and prevented any contact between the natural father and his daughter. The trial court also found the natural father killed the natural mother "and by such willful act the natural father has willfully abandoned the child to be cared for by persons other than himself or the child's other natural parent." We repeat, this finding is not authorized by Section 453.040 RSMo 1986. Neither of these findings directly address the intent of the natural father to relinquish custody and never again claim any rights or duties of a parent.

The circumstances in the present case do not indicate willful abandonment by appellant. Petitioner's action in attempting to shelter A.R.M. from appellant's family must be considered. This court has indicated, and other states have held, that acts of a custodian to hinder communication must be taken into consideration in adoption cases where abandonment is the issue. *See, e.g., In re Adoption of S.E.F.*, 634 S.W.2d 265, 267 (Mo.App.1982); *In the Matter of Cedo Pavolovic*, 124 A.D.2d 732, 508 N.Y.S.2d 234, 236 (N.Y.App.1986); *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 613, 619–621 (Ohio 1985).

A custodian who denies an incarcerated parent access to his child should not then be allowed to claim abandonment by the parent to support an adoption. The single-act theory finds no support in the grounds provided for termination under Chapter 211. For that additional reason it should be rejected.

We find the reasoning in *S.M.K. v. R.G.G.*, 702 P.2d 620 (Alaska 1985) persuasive. In that case that court said, "We are astonished that the Kayes could plea to this court the 'unjustified' action of Stuart's mother, when it was the Kayes and other members of Dennis's family who collaborated to wrongfully deny Stuart access to his mother during Stuart's first few years of life." *Id.* at 625. The present appeal involves the same condition. Petitioner adopted a restrictive attitude that the Chapter 211 custody order of the juvenile court ratified denying access to A.R.M. by any of the father's relatives. There was no evidence to support a finding that this attitude was justified by any event other than the acts of father involving the death of petitioner's daughter, the mother of A.R.M. If father had been free this attitude would have prevented any communication. But he was not free; he was in prison. Surprisingly, the social worker recommended adoption without ever talking to appellant-father about any of the issues and particularly about his interest in his daughter.

In making the recommendation for adoption the social worker was aware and the court learned in regard to the issue of abandonment that father did attempt to maintain communication with his daughter while imprisoned and in the face of the conduct of petitioner. At the adoption hearing father testified that he sent A.R.M. a 1982 Easter card, a June 1982 birthday card, and a 1982 Christmas card with a gift supplied by the Salvation Army. Petitioner did not rebut this evidence. It was also during this time that father requested his mother and current wife to visit A.R.M. In letters sent to his wife he requested that she contact an attorney concerning his daughter and indicated that he planned to assume his role as parent when released from prison. Other letters written within the six month period expressed similar intent. The issue was *voluntary, intentional* and permanent relinquishment, but the social worker did not investigate or consider any of these acts of petitioner or any acts of father. Her testimony, therefore, was of little or no probative value.

Each adoption must be judged on its own unique set of facts. *In re Adoption of M.D.L.*, 682 S.W.2d 886, 888 (Mo.App.1984). The facts in the present case indicate that petitioner affirmatively prevented representatives of father from communicating with his daughter on his behalf and used the November 1981 juvenile court custody

order, which granted no visitation rights to anyone, to her own advantage. Also surprisingly, a social worker agreed with petitioner that the order did not require her to permit temporary custody or visitation. The order was used as a license to "steal" the child if petitioner is permitted to thereafter claim abandonment. We do not believe that the juvenile court in 1981 intended by awarding temporary custody to petitioner to deny A.R.M. direct access to her paternal grandparents who were faultless or to deny them access to her and indirect access to father. We repeat, there was no indication of any disqualifying acts by the paternal grandparents. Further, there was no evidence that any social worker or representative of the Juvenile Court ever made an effort to establish a means of communication between father and daughter. We recently observed in a termination of parental rights proceeding with a similar factual situation and said, "there never was any recognition of even an ultimate prospect to reconcile father and daughter, only a studied purpose to consummate the adoption." *In Interest of Baby Girl W.,* 728 S.W.2d 545, 549 (Mo.App.1987).

This adoption proceeding may be similar on the common issue of abandonment but it is not the same as a termination proceeding under Chapter 211. It is unlikely that the trial court in a termination proceeding would proceed without an interview with the father who was incarcerated. Under the circumstances and facts presented to the trial court by all of the witnesses, including the testimony of petitioner, it is astonishing that father was not interviewed. He was incarcerated in Pacific, Missouri, which lies near to St. Louis.

The court considered evidence on the best interest of A.R.M. We do not reach and the trial court erred in reaching that issue on *the petition of the maternal grandmother who was the moving force in separating A.R.M. from father and his family.* It is only *after* making a determination that one of the statutory grounds for dispensing with parental consent has been met that a court may reach this issue. *Adoption of Richards,* 624 S.W.2d at 485;

*B.J.D.B. v. J.B.G.,* 698 S.W.2d 328, 330 (Mo.App.1985).

On evidence not disputed by petitioner she was not entitled to a finding of abandonment. "Where, as here, the evidence indicates that a parent's efforts to visit, contact or communicate with his child have been thwarted or interfered with, a finding of abandonment as a matter of law is improper and unjustified since there is no showing of a 'purposeful ridding of parental obligations * * * [nor] a withholding of interest, presence, affection, care and support.'" *In the Matter of Cedo Pavolovic,* 124 A.D.2d 732, 508 N.Y.S.2d 234, 236 (N.Y.App.1986). The court erred as a matter of law in finding abandonment on behalf of this petitioner because of her undisputed acts which foreclose a finding that father abandoned A.R.M. within the meaning of Section 453.040(5) RSMo 1986. It is not possible on her petition and for her benefit to determine that the father evidenced "an intent or mental attitude to forsake the status of a parent—at least for the period of time declared in the statute." *In re Adoption of S.E.F.,* 634 S.W.2d 265, 267 (Mo.App.1982), citing *In re Adoption of Rule,* 435 S.W.2d 35, 40 (Mo.App.1968). In *S.E.F.,* the father was unable to write or send cards to a child who could not read and his efforts to communicate by telephone were terminated by the mother. The court affirmed a denial of abandonment on similar facts.

In the present case father opposed the adoption and filed a motion to intervene and contest the transfer of custody and adoption. In March of 1984, while on release pending retrial, he filed a motion for custody of A.R.M. This motion was never tried, but was before the court when the adoption proceeding was heard. This significant fact is proven by documents in the court file. It is powerful evidence opposing the claim of willful and permanent abandonment which the trial court and majority opinion do not consider.

The record indicates that after being imprisoned appellant maintained an interest in his daughter and did not intend to relinquish all parental claims to A.R.M. *See, Matter of T.C.M.,* 651 S.W.2d 525, 529 (Mo. App.1983). He expressed a continued in-

terest in A.R.M. personally and by numerous letters addressed to his mother and his current wife in addition to the motion to modify the placement order. He inquired about his daughter and requested his mother and his wife to visit A.R.M. Both testified at the adoption hearing that they attempted visitation, *but petitioner refused to permit visitation.* Petitioner did not deny the truth of this evidence.

The following incidents exemplify petitioner's uncooperative attitude toward father and his family. After the juvenile court placed A.R.M. with petitioner she requested the paternal grandmother to provide baby furniture for A.R.M. When paternal grandmother attempted to deliver the bedroom furniture petitioner's husband told her to leave the furniture outside because "we don't want you around here." Paternal grandmother attempted visitation two or three times a week at petitioner's home, but no one would answer the door. On the occasion of one visit, she saw A.R.M. in the window. A.R.M. called out to her, but then disappeared from the window and no one would answer the door. She attempted phone calls to arrange a visit with A.R.M., but petitioner changed her telephone to an unlisted number. Father was informed of these roadblocks.

Father's new wife testified that she too attempted to visit A.R.M. at father's request, but petitioner refused to permit any communication with A.R.M. She testified that during one visit petitioner forced her to leave upon discovering the visit was at father's request. On another occasion the new wife saw A.R.M. and petitioner at the St. Louis Zoo. She wanted to photograph A.R.M., but petitioner refused to permit any pictures and told the new wife to relay all contact with A.R.M. "through the court." Father's wife also communicated petitioner's uncooperative attitude and disposition to father.

Father was imprisoned during the time immediately preceding the filing of the adoption petition. His incarceration rendered him unable to visit the child, and his only means of contact with A.R.M. was through others. A.R.M. was four years old at the time and unable to read letters appellant sent. Petitioner's attitude toward father's family gave him reason to believe that petitioner would not read any letters he might send. All communication with A.R.M. must therefore be considered in the context of his imprisonment. *See, Lewis v. Roberts,* 495 N.E.2d 810, 813 (Ind.App. 1986). Incarceration alone does not constitute per se abandonment, *In re Adoption of K.L.G.,* 639 S.W.2d 619, 626 (Mo.App. 1982), and it unquestionably alters means for significant communication. *Lewis,* 495 N.E.2d at 813.

Unfortunately, the decision in this case stands for the proposition that a petitioner for adoption solely on the basis of abandonment may make that claim in the face of undisputed evidence that the petitioner wholly foreclosed any communication between the natural parent and the child. We hold the view that that evidence renders the requirement that this petitioner prove willful abandonment an impossible burden which could not be and was not met. The law will not require a useless act and any efforts of this father to communicate with his child would have been useless. This holding will imperil the rights of non-custodial parents following dissolution proceedings. It will encourage the custodial parent to discourage or hinder the relationship between the non-custodial parent and the child. This is not an unusual situation. The attendant risk is that the non-custodial parent will be found to have abandoned his child for a petitioner who has done no more than the present petitioner which diminished the required pleading and proof of willful abandonment. For this reason a decision on the disqualification of such petitioner who claims abandonment is a matter of general interest and importance not previously decided by our Supreme Court.

We find that the view of the majority opinion adopts a rule of law that is properly a matter for decision either of the legislature or the Supreme Court. In addition, the decision of the majority fails to deal with the jurisdictional question of petitioner's qualifications to rely on abandonment to replace consent.

We believe the majority opinion is in conflict with previous opinions of the Supreme Court and other courts of appeal in the following respects.

First, the opinion of the majority is in conflict with prior appellate opinions of this

state which required strict construction in favor of natural parents of adoptions statutes. The majority opinion conflicts with *In re Adoption of W.B.L.,* 681 S.W.2d 452 (Mo. banc 1984). The Supreme Court there affirmed as a rule of law "that adoption statutes are to be strictly construed in favor of the natural parent." *Id.* at 455. The opinion of the majority in the present case allows a single act of homicide as a ground for adoption. The adoption statute contains no such provision. It requires abandonment over a period of six months which indicates a legislative intent that a single act is insufficient to support a finding of abandonment. Nor does Chapter 211 authorize a single act of homicide by one parent against another as a ground for termination of parental rights. The majority opinion ignores and conflicts with the rule. It does not follow the controlling opinion of the Supreme Court.

Second, the opinion of the majority conflicts with a previous decision of the Kansas City District, *In the Matter of the Adoption of Rule,* 435 S.W.2d 35 (Mo.App. 1968). That court also recognized, "[a]s a matter of simple justice the adoption statutes are to be strictly construed in favor of the natural parent." *Id.* at 40. With reference to the question of willful abandonment the court observed, "the conduct of the parent must evidence an intent or mental attitude to forsake the status of a parent—at least for the period of time declared in the statute." *Id.* at 40. The court there reversed an adoption by the natural mother and stepfather which served to terminate the parental rights of the natural father. The court recognized that in considering the issue of adoption the courts have consistently recognized and sought to preserve the rights of the natural parents. *Id.* at 41. The court distinguished previous cases which went to show a complete lack of interest on the part of the natural parent whose rights were terminated by adoption. Except for the act of homicide there are no facts available to the trial court in the present case from which the court could find anything derogatory of appellant in terms of his intent to abandon, or lack thereof.

We respectfully dissent.