In re Bonnie June AYRES.

Norma AYRES, natural mother, Appellant,

v.

Gilbert J. LONG, juvenile officer, and
Charles W. Ayres, natural
father, Respondents.

No. 35292.

Missouri Court of Appeals,
St. Louis District,
Division Two.

July 9, 1974.

Motion for Rehearing or to Transfer to
Supreme Court En Banc Denied
Sept. 11, 1974.

Mogab, Hughes & Green, Inc., Frank B. Green, St. Louis, for appellant.

Williams, Wade, Murphy & Horsley, Brent J. Williams, Clayton, for respondents.

McMILLIAN, Judge.

This is an appeal by Norma Ayres, the natural mother of Bonnie June, her minor child, from a judgment entered by the Circuit Court of Washington County, Missouri, declaring Bonnie June to be a neglected child and placing her under the control of the Washington County Division of Welfare with the temporary custody in

Mr. and Mrs. Joseph Benson. Inasmuch as our review of the record, transcript, and exhibits before the court reveals no neglect, we reverse and remand with directions.

Charles married Norma in Washington County on April 23, 1960. At the outset they purchased a home, but because they failed to keep up the mortgage payments the home was lost. After living for a short period with Charles' mother, Mrs. Dean, the couple rented an apartment in St. Louis. By 1964 they had four children, and in the same year Charles began to have serious drinking problems. His propensity for violent conduct within the family and toward its members coupled with the misuse of alcohol reduced the marital relationship to a series of separations and short-lived reconciliations lived out in furnished rooms amidst an atmosphere of poverty, unpaid bills, deprivation, and physical cruelty punctuated by the birth of five children prior to the final separation in July, 1967. During the separations the participants resided with family or in-laws in Potosi.

In January, 1964, there had been a party at the place where Norma worked; however, because she was tired she did not go. After looking for her at the party, Charles went home and found her asleep on the couch. He jerked her from the couch and beat her savagely with a board. In fear of her life she fled. At that time Claude, Charles' brother, and Sue, Norma's sister lived with the Ayres.

In Norma's absence Sue and Claude took Bonnie and her brother, Robert, to the Benson's home and, according to Mrs. Benson and Charles' sister Irma, Sue showed them a letter purportedly from Norma directed to Charles telling him to give the Bensons both children. The Benson's refused to accept either child. Sue denied ever seeing such a letter and Norma denied writing such a letter. In any event, Mrs. Benson later, accompanied by her sister, came to St. Louis and with Charles' per-

mission obtained Bonnie June, who was then 9 months of age.

The evidence is undisputed that Charles was a drunken brute and that Norma's fear of him was well-founded. On one occasion, he kicked a glass jar against her severing her Achilles tendon and incapacitating her for two months in a cast. On another, he struck her between the eyes with a beer can leaving a permanent scar. Also there was evidence that after the reconciliation following the board beating he had given Norma, every time Norma sought his permission to get Bonnie back, he would severely beat her. Finally in 1967 she left Charles for good.

After the separation Norma's oldest son, Charles, Jr., called Billy, fell from a window fracturing his jaw in four places. As he was recovering he was stricken by pneumonia and thereafter suffered a stroke. As a result of the stroke he was left with a right hemoparesis and aphasic. Subsequently, Norma transferred him from City Hospital to Jewish Hospital so that he could receive specialized therapy. During this entire period, from the separation to December, 1968, Norma worked and supported her four children without any aid from the state. But when Billy entered Jewish Hospital, Mrs. Alpert, her social case worker, advised her that the other children needed her full-time. Acting upon this advice and with Mrs. Alpert's help, she applied for and received aid to dependent children. Her stipend was $158.00 per month out of which she purchased a U-235 home, a government assisted housing program; she pays $81.00 a month on the mortgage and $26.00 for food stamps so that she can purchase $132.00 worth of food. Mrs. Alpert obtained part-time employment for Norma as an aid companion to an elderly woman.

Likewise there is no controversy that during the entire period that Mrs. Benson has had Bonnie, the mother has shown a genuine concern for her. She visited her frequently in Potosi traveling by bus,

bringing along all the other children. She gave Bonnie such money as she had and recognized her presence on most special occasions.

Five social workers, two from Washington County and three from the City of St. Louis, testified in glowing terms about Mrs. Ayres' capacity as a homemaker. Each said she is stable, the children are well-behaved and attend school and church regularly. Each said she is a concerned mother, who readily seeks help for her children, accepts supervision and follows through on advice given for their betterment.

Until August, 1972, when Bonnie fractured her arm and Mrs. Benson talked of getting permanent custody of her, no dissension existed between Mrs. Benson and Norma. In September, 1972, Norma tried to get Bonnie, but Mrs. Benson refused to let her go. After being rebuffed by the local police chief, the local juvenile officer, she sought legal assistance. Attorney Robert A. McIlrath advised her to pick up Bonnie at the school; however, when she went to the school the principal told her that Mrs. Benson had kept Bonnie at home for a few days. Once again she unavailingly sought for help from the local sheriff. Next, she contacted Attorney Richard Hughes for advice, who filed a divorce suit on her behalf and the petition asked for custody of all five children.

In the meantime, Mrs. Benson, following up a November, 1971, visit with Mr. Gilbert A. Long, county juvenile officer, prevailed upon him in September, 1972, to file the neglect petition. While Norma was in the Washington County Court seeking a continuance on the neglect petition, she was served a summons and petition for an adoption suit filed by the Bensons.

During the time that Bonnie was with the Bensons, there is no question that neither parent contributed any sustained support money for the child. Yet, on the other hand, the Bensons never sought or requested any help from either parent.

Norma concedes, and there is no issue, that the Bensons have done an excellent job in rearing Bonnie. On the date the petition was filed, Bonnie was well-adjusted and provided for by the Bensons and was receiving proper parental care and guidance.

The petition claims that (1) the natural parents have failed and refused to provide support, education, medical care, and other care necessary for the well-being of the child; (2) the parents had deserted the child; (3) the mother failed to name the child in her application for aid to dependent children; and (4) the behavior, environment or associations of the child are injurious to her welfare, and therefore in need of intervention by the Juvenile Court. § 211.031(1)(a)(c), RSMo 1969, V.A.M.S.

Although no request for findings of fact and conclusions of law was made pursuant to Rule 73.01(b), V.A.M.R.(1974), the court's order left a lot to be desired. It baldly stated, ". . . [T]hat the child was otherwise without care, custody or support, and . . . adjudged the child neglected . . ." No reference was made to § 211.031(1)(a) or (c); therefore, the court's sole basis for its order seemingly was founded upon § 211.031(1)(b). Indeed, the finding of the court recited § 211.031(1)(b) verbatim; i. e., "(b) The child is otherwise without proper care, custody or support." To support this charge the petition merely alleged that the "[n]atural mother of child, in applying for Aid to Dependent Children, failed to declare above-named child as one of her children."

■ Since the petition filed herein was grounded upon § 211.031, RSMo 1969, V.A.M.S., our review takes the form of a de novo proceeding wherein we defer to the findings of the trial court unless the judgment is completely erroneous. In the Interest of T.J.A. et al., 407 S.W.2d 573 (Mo.App.1966).

■ In our opinion, subsection (1)(a) of § 211.031 pertains to either parental ne-glect or neglect by any other person who has received the custody of the child by a court order. Subsection (1)(b) of § 211.-031 pertains to any other persons not described in subsection (1)(a) who may have the physical custody of a child gained by either parental placement or placement by non-parents or self-help; or, dependent children who may have been deprived of both parents by a common disaster and therefore have no responsible adult in the community to assume their custody. In this category could also be placed runaway children found in the community without parental or adult guidance. In the instant case § 211.031(1)(b) was applicable to the Bensons because they had physical custody of Bonnie, i. e., Bonnie was turned over to them by the father, not a court order. However, there was no charge or evidence that they were neglectful in any manner whatsoever. Consequently, the court's finding of neglect against the mother, if pursuant to § 211.031(1)(b), was erroneous for two reasons: (1) subsection (1)(b) does not apply to parental neglect that could be charged to a parent only pursuant to § 211.031(1)(a), and (2) the Bensons were not guilty of any neglect.

■ Assuming, however, for purpose of argument that the court's finding was really directed to subsection (1)(a) of § 211.-031, we turn to the allegation in the petition under that section. First, we hasten to point out that there is no merit whatsoever in the allegation that the mother failed to name Bonnie in her application for aid to dependent children as a part of her grant, because since she did not have custody of Bonnie to have included her name in the application would have been fraudulent.

■■ Next, the allegation pertaining to desertion is not factually supported by the evidence. The evidence showed the Bensons received Bonnie upon the father's request and by his authority. Because of fear engendered by her husband's savage

attacks upon her Norma impliedly acquiesced in his decision. Yet, at all times she evidenced a continuing maternal concern and interest in her daughter. Besides there is no evidence that the mother at any time abandoned Bonnie. Abandonment must be wilful or a course of conduct which impliedly shows a conscious disregard or indifference to the child in respect to one's maternal obligations owed to the child. Here, within her meager means, the mother saw Bonnie as often as possible under the circumstances and tried to keep her family intact by bringing along her other children to see Bonnie on each visit. Nowhere in the evidence do we find that the mother wilfully abandoned Bonnie, nor that her conduct showed a disregard or indifference in respect to her obligation due Bonnie. So, the abandonment or desertion claim is unfounded.

Next, we take up the claim that the parents or other persons legally responsible for the care and support of the child have neglected and refused to provide proper support, education, medical, surgical or other care necessary to the child's well-being. First, we rule out "other persons legally responsible" since such a person was non-existent because no court order had placed Bonnie with anyone. Secondly, we rule out refusal of Norma to give support because there is no evidence that the Bensons ever sought any help, or expected any help from the mother. Thirdly, at the time the petition was filed, there was no evidence that Bonnie was neglected in any sense of the word. Here, the father requested and, by his authority, placed Bonnie with his sister and her husband by their consent. Under the circumstances shown herein, we would set a dangerous precedent of charging the parents with neglect and depriving them of the natural custody of their children if every time parents placed the physical custody of their children with a surrogate or a member of their extended family because of a temporary inability—on account of economic reasons, illness, marital disruptions or otherwise failed to provide for their children. On principle, when tragedy strikes and the parents are beleaguered by problems beyond their control, in our opinion, a placement with a more fortunate relative or concerned friend would appear to be the best thing reasonable, concerned, caring parents could do for their children. See Hendricks v. Curry, 401 S.W.2d 796 (Tex. 1966) and Hogan v. Roop et ux., 500 S.W. 2d 936 (Tex.Civ.App. 1973). The basic goal of a neglect law is to prevent the social, physical, and psychological deterioration of children. None of these evils was present in this case either immediately before the petition was filed, or at the time the petition was filed, or at the time of the hearing. Here, parental care was provided by the Bensons, members of Bonnie's extended family, who occupied a parental position in the life of the child and who has assumed this relationship voluntarily upon request. This is not the case where, the request and placement once being made, the parents, especially the mother, totally ignored the existence of the child, and showed no further parental interest and concern. Accordingly, we find no evidence to support the findings of the court that Bonnie June was a neglected child. Thus, the judgment is reversed and remanded with instructions to the trial court to set aside and hold for naught its wardship and control order over the person of Bonnie June, and its custody order entered in pursuance thereto, and finally, to dismiss the petition.

SMITH, P. J., and CLEMENS and GUNN, JJ., concur.