662 S.W.2d 893 (1983)
In the Interest of J.H.H., a minor under the age of 17 years, Respondent,
v.
J.D., Appellant.
No. 46318.
Missouri Court of Appeals, Eastern District, Division Three.
December 20, 1983.
*894 Joseph R. Calhoun, Louisiana, for respondent.
Walter D. McQuie, Hannibal, for appellant.
CRANDALL, Judge.
The natural mother of the eight-year old child herein, J.H.H., appeals from an order of the juvenile court terminating her parental rights in him pursuant to § 211.447.2(2)(a)b., RSMo (Supp.1982)[1] based on a finding that she had abandoned him. On appeal, the mother argues that *895 there was insufficient evidence to support the court's findings of both abandonment and that termination of the mother's parental rights would be in the child's best interest. She also contends that, assuming abandonment could be found, the juvenile court erred in failing to find that the abandonment was repented and terminated by her good faith effort to resume the parent-child relationship. The juvenile court's order, however, rests on substantial evidence of abandonment that is sufficiently clear, cogent and convincing to justify termination of the mother's parental rights, § 211.447.2(2)(a). That, together with the absence of any error of law, requires us to affirm the juvenile court's order. Rule 73.01(c); and see H.D. v. E.D., 629 S.W.2d 655, 657 (Mo.App.1982).
The mother has two children in addition to J.H.H. All of the children have been parceled out to various family members to raise. On the day after Thanksgiving in 1978, J.H.H. was sent to live with his mother's childless aunt and uncle in Louisiana, Missouri, allegedly because the mother and her unemployed husband[2] were financially unable to keep him. This arrangement was intended to be permanent, though it was understood that the mother would be permitted to visit at any time. It was also understood that the aunt and uncle would support the child, which they did. The mother's sole financial contribution over the next three and one-half years was five dollars sent to J.H.H. as a birthday gift.
The mother saw J.H.H. twice during the two or three months after he moved to the aunt's and uncle's home, once for about three hours a month after he arrived there and again a couple of days later. The mother and her husband then moved to the State of Oregon without notifying the child or the aunt and without leaving any forwarding address. The mother still maintains her permanent address in Oregon.
Though the mother's husband soon secured employment at a starting wage of nearly five dollars an hour, the mother remained unemployed for well over a year.[3] During that time she had no contact with either J.H.H. or his custodians. She next saw J.H.H. when she returned to Missouri for a brief visit some time in 1980. By that time her son could not recognize her. The mother was again in Missouri during February and March of 1981, staying with her mother in the town of Elsberry, which we judicially notice to be within easy driving distance of J.H.H.'s home in Louisiana. State v. Kenyon, 343 Mo. 1168, 126 S.W.2d 245, 254 (1938). During this visit, the mother did not contact the child or his custodians.
When the mother returned to Oregon in 1981, she began to call and write to her aunt frequently, calling (according to the aunt) at least once a week and sometimes twice a day. The record does not disclose the substance of the mother's phone calls and letters to her aunt. The record does reveal, however, that the mother's purpose was to communicate with her aunt, rather than maintain any relationship with her son. It was during this period that the mother learned from the aunt of J.H.H.'s emotional problemsproblems that became manifest to the aunt and eventually to *896 school authorities as sleeplessness, morbidity and petty thievery. As the child became progressively more unmanageable, the aunt sought help through the Division of Family Services. The mother was kept informed of her child's deteriorating emotional health and was aware of the aunt's financial inability to secure help for him. The mother's response was merely to accede to whatever measures the aunt and the Division of Family Services thought proper, including placing the child in foster care. She showed no further interest in the child until she was served with the petition to terminate her parental rights and thus free the child for adoption. She then returned to Missouri a month before the hearing to contest the matter and, in that context, secured "visitation privileges." Her plan for the child is to take him to Oregon with her and to try to get help for him there through the public welfare authorities.
Thus, the record before us is that except for the two short visits shortly after J.H.H. arrived at the aunt's and uncle's home in 1978, and except for the visit in 1980, the mother hadn't seen this child during the three and one-half years prior to the commencement of this proceeding. Except for one five dollar birthday gift, she has made no financial contribution whatever during those years to either his support or well-being. She has sent no other gifts to him. She sent the child one Christmas card. According to the aunt, she "usually" sent him a birthday card. Though the mother maintained close contact with the aunt during the approximately one and one-half years prior to hearing herein, she had virtually no contact with J.H.H.
Was there substantial evidence to support the finding of abandonment? We held in H.D. v. E.D., 629 S.W.2d at 658 that a finding of abandonment under § 211.447.2(2)(a)b., RSMo (1978) required finding both a failure to support the child and a failure to communicate with or to visit the child within the prescribed statutory period. The mother first argues she supported the child in that, being financially unable to do so herself, she placed him with a more fortunate relative who assumed her support obligation. We did recognize in H.D. v. E.D., 629 S.W.2d at 658, that "where there is good cause because of a temporary situation a parent may leave a child in the custody of a third party without abandoning the child." And see In re Ayres v. Long, 513 S.W.2d 731, 735 (Mo.App.1974).
There was no "temporary situation" here. As we noted earlier, the understanding of all involved was that J.H.H.'s living at the aunt's and uncle's home was a permanent arrangement. Here, as in H.D. v. E.D., the caretaker's gratuitous promise to the mother to care for her child indefinitely is best seen as token support by the mother which the court properly ignored. Id. at 658. The juvenile court also properly found the mother's sporadic communications with J.H.H. to be, at best, mere token efforts to preserve the parent-child relationship. In short, the record is replete with substantial evidence to support the juvenile court's finding that, for a period of at least six months, the mother had left J.H.H. without any provision for support and without any communication or visitation and had therefore abandoned him.
Did mother repent and terminate the abandonment? A parent may repent an abandonment by at least making a reasonable effort to assume parental responsibility and to perform parental duties, in which case the abandonment is no longer a ground for termination of parental rights. In re Adoption of K.L.G., 639 S.W.2d 619, 626 (Mo.App.1982); In re Trapp, 528 S.W.2d 489, 495 (Mo.App.1975). The record before us does not show repentance. We noted earlier that the mother's infrequent visits were not efforts to preserve the parent-child relationship. They certainly were not good faith efforts to either assume or perform parental responsibilities. The superficial nature of her few contacts with J.H.H. by phone and mail becomes all the more poignant when set against the standards in *897 Lambertus v. Santino, 608 S.W.2d 502, 506 (Mo.App.1980):
More to the point ... is the matter of communicationcommunication of love and affection by a parent to a child; the parent's expression of interest in the child and his world; the communicated desire to be in the child's company whenever possible; the development of a commonality of interest and an empathy with him. These are the things that count heavily in a situation where by force of circumstances personal visitation is impossible.
The juvenile court's failure to find that the mother repented her abandonment was not error.
The mother's last contention is that the juvenile court erred in finding that termination of her parental rights in J.H.H. is in the best interest of the child. While we acknowledge "the best interest of the child" to be among those "imprecise substantive standards that leave determinations unusually open to the subjective values of the judge," Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 1399, 71 L.Ed.2d 599 (1982), in the context of termination of parental rights proceedings it connotes the parens patriae interest in providing the child with a permanent home. Id. 102 S.Ct. at 1401. It includes the child's need for a "home in which the child will be housed, fed, clothed and educated, at least according to acceptable community standards." In re C___, 468 S.W.2d 689, (Mo.App. 1971).
J.H.H. is a young, emotionally disturbed child who had been abandoned by his mother and left with a great-aunt who eventually could neither handle him nor financially afford the special treatment he needs. The options before the juvenile court were clear-cut. The status quomaintaining the child in the limbo of foster carewas untenable. Mother's eleventh hour plan to take the child to Oregon and somehow properly care for him there rests more on fantasy than reality and, all things considered, was equally untenable. The third option was that proposed by the Division of Family Servicesan adoptive placement in a unique family setting in which this boy will receive proper treatment and care. Of the three options, the one proposed by the Division at least has the possibility of repairing the damage that has been done to this child. Since the adoptive placement was the only viable option which would provide the child with a permanent home, the termination was in the best interest of the child. As for the mother's complaint that "no consideration was given to any placement which included [her] in any capacity," we iterate our observation that no plan before the court that included her in any capacity was tenable. The mother's final contention is denied.
The order terminating the mother's parental rights in J.H.H. is affirmed.
KAROHL, P.J., and REINHARD, J., concur.
NOTES
[1] Section 211.447.2(2)(a)b, RSMo (Supp.1982) provides (all further references to statutory sections are to RSMo (Supp.1982) unless indicated otherwise):

2. The juvenile court may, upon a petition filed by the juvenile officer under this section, terminate the rights of parent to a child if it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist:
* * * * * *
(2) When it appears by clear, cogent and convincing evidence that one or more of the following conditions exist:
(a) The parent has abandoned the child. The court may find that the parent has abandoned the child if, for a period of six months or longer for a child over one year old or a period of sixty days or longer for a child under one year of age at the time of the filing of the petition, either of the following has occurred:
* * * * * *
b. The parent has, without good cause, left the child without any provision for support and without any communication or visitation from the parent. Evidence that the parent has acted to support, to communicate with or to visit the child during the period may be disregarded if such acts of the parent appear to have been merely a token effort[.]
This section was enacted through Laws of Mo. 1982, p. 419, 431-32 and re-enacts virtually identical provisions found earlier in § 211.447.2(2)(a)b, RSMo (1978).
[2] The mother's husband is not the father of J.H.H. The natural father's whereabouts are apparently unknown and he is not a party to this appeal.
[3] The mother's employment prospects had not materially improved by the time of the juvenile court's hearing. Her Oregon employment history consists, first, of her working in her own home for an unspecified period of time in 1981 as a "day care provider" earning $30 per month. At the time of the hearing in August 1982, she had been engaged since the end of May that year as a housekeeper and cook for an elderly diabetic for which she earned per month "[o]ne hundred dollars cash and one hundred dollars ... for my food."

In addition, the mother's husband was fired from his job in August 1981 and at the time of the hearing was unemployed.