**In the Interest of D\_\_\_\_
V\_\_\_\_ V\_\_\_\_, Jr.**

**J. Patrick DOYEN, Juvenile Officer,
Judicial Circuit 25, Respondent,**

v.

**M\_\_\_\_ M. S \_\_\_\_, Appellant,
and D\_\_\_\_ V\_\_\_\_.**

No. 13239.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 11, 1984.

Rich D. Moore, Moore, Brill & Wagoner, P.C., West Plains, for appellant.

Brad D. Eidson, Houston, for respondent.

CROW, Judge.

M_____ M. S_____ (hereafter "M") appeals from an order terminating her parental rights to her son, D_____ V_____ V_____, Jr. (hereafter "D"). §§ 211.-477-.482, RSMo 1978. The issues necessitate a chronology of the significant events and a summary of the evidence.

D was born to M and her then-husband, D_____ V_____ (hereafter "the father"), on October 24, 1976.

We glean from an order of the Juvenile Division of the Circuit Court of Texas County dated March 20, 1978, that D came to the attention of caseworkers of the Division of Family Services (hereafter "Division") the preceding day (March 19). According to the order, caseworkers investigated an "abuse complaint" at the residence of M and the father that date. The order recites that D had discoloration and puffiness around his left eye, and both eyes were nearly closed due to apparent untreated infection. The order adds that on March 20, caseworkers returned to the home and found a bruise on the left side of D's face, which had not been there the previous day. The order reveals that M reported to the caseworkers that she had heard a slapping noise from a room where the father and D were located, after which D began to cry. M's mother, according to the order, disclosed that the father had at times beaten M and D.

The caseworkers removed D from the home of M and the father on March 20, taking D to a hospital for examination and treatment. The order of March 20 placed D in the temporary custody of the Division "pending further orders of this Court."

The next day (March 21, 1978), the Division placed D in the actual custody of D_____ R_____ and her husband, A_____ R_____ ("the foster parents").

In an amended petition filed May 12, 1978, in the Juvenile Court of Texas County,[1] the Juvenile Officer of that County alleged that D was within the jurisdiction of that Court in that (a) the behavior, environment and associations of D were injurious to his welfare and the welfare of others, (b) M had stated that she is unable to provide proper care, custody, or support for D and that the father had left the family home, and (c) the father had stated he is unable to provide proper care, custody, or support due to his physical and mental condition.

Though the petition asserted that jurisdiction lay under "Section 211.031(1)(c)," it appears that the factual allegations, if true, would have conferred jurisdiction under paragraphs (a) or (b) of § 211.031.1(1), RSMo 1969, as amended by Laws 1975–76, pp. 685–86.[2]

Be that as it may, a hearing was held September 5, 1978, and by order entered that date, § 211.181, RSMo 1969, as amended by Laws 1973–74, p. 821, the Juvenile Court found that D came "within the provisions of Section 211.031 RSMO." Specifically, the court found:

"Neither the natural father nor the natural mother can provide the child

---

1. Prior to January 2, 1979, the term "juvenile court," as applied to Judicial Circuit 25, which includes Texas County, § 478.137, RSMo 1969, meant the Juvenile Division of the Circuit Court of that County. § 211.021(3), RSMo 1969; § 478.700, RSMo Supp.1975.

2. The 1978 revision of RSMo was not in effect at the time the amended petition was filed. Section 211.031, when it appeared in RSMo 1978, was unchanged from the 1976 amendment identified above. Section 211.031 was, however, later amended by Laws 1980, pp. 332–33. After the 1980 amendment, § 211.031.1(1) no longer contained a paragraph (c). Some of what had appeared in that paragraph appeared thereafter in paragraph (d) of § 211.031.1(2). The 1980 amendment, coming after the adjudication of the amended petition, does not affect this case.

named above with proper care, custody, or support.

The Court further finds that both the natural father and the natural mother desire that said above named child remain in the custody of Texas County Missouri Division of Family Services until further order of this Court."

The court committed D to the custody of the Texas County office of the Division, for placement in foster care.

At the time of the order of September 5, 1978, D was still in the actual custody of the foster parents, having been there continuously since the temporary placement of March 21, 1978. He would remain with them another two and a half years.

According to the evidence, M had visited D twice during his first two months in foster care, once in March, 1978, and the second time in May. M had then hitchhiked to Nashville, Tennessee, alone, for the avowed purpose of finding work. M did not tell the Division she was leaving, nor did she report her whereabouts while gone. M explained her secrecy by stating that she had separated from the father and did not want him to know where she was "because he was bothering me all the time and I was trying to get away from him."

M returned to Texas County in August, 1978, and attended the September 5 hearing in person. She visited D once during September, then on October 18, 1978, she signed a "contract agreement" with the Division. That agreement set out certain conditions that M was expected to fulfill in order to regain custody of D.[3]

M visited D again in November, 1978, then embarked for California in December with a man, F_____ S_____ (hereafter "F"). M was 23 years of age at that time, and F was 35. According to M, the purpose of the journey was to find work. As with her previous departure, she did not notify the Division she was leaving, or where she was during her absence.

M returned to Texas County in May, 1979, and reported to the Division. She visited D twice that month.

Soon afterward, M and F departed for Mt. Vernon, Illinois, where M found employment as a dishwasher and cook's helper, and F was hired as an "all-around handyman" at a department store. At first, M and F resided with F's mother and stepfather in Mt. Vernon; later they rented a one-bedroom house for $125 per month. Some time in July, 1979, M filed suit to dissolve her marriage with the father.

M reported her whereabouts to the Division in Texas County by telephone, and the Division requested the Mt. Vernon Field Office of the Illinois Department of Children and Family Services to make a home study "for the possible placement" of D with M and F. The study, transmitted to the Division on August 8, 1979, was described by a caseworker as "unfavorable."

A second study, forwarded to the Division from Illinois on April 14, 1980, disclosed that M had obtained a divorce from the father on September 28, 1979, and had married F six days later. They continued to reside in the rented house, and F still had his job at the department store. M, however, was no longer employed. She was pregnant, expecting delivery in June, 1980.

As a result of the second study, the Division agreed to allow M to have "trial visits" with D, preparatory to returning him to her "for a trial-basis custody." These arrangements evidently proved satisfactory because on March 9, 1981, after nearly three years with the foster parents, D was restored to the physical custody of M, legal custody remaining with the Division. The Juvenile Officer testified that this step "was more my decision than anyone else's." D, then 4 years and 4 months old, weighed 36 pounds.

On September 11, 1981, a schoolteacher in Mt. Vernon advised Illinois officials by

---

**3.** The conditions included applying for work, seeking proper housing, remaining apart from the father and encouraging him to obtain a divorce, keeping scheduled visits with D, and contributing to his support if possible.

phone that D "had been coming to school with a lot of bruises." A caseworker examined D at school and observed a cut on the back of his head and a sore nose. D also had "some small spot bruising on his body," and a small scab on the right side of his neck.

The caseworker contacted M and F, who attributed the marks to sundry causes, none of which was abuse.

On September 15, 1981, the teacher observed a "yellowish-green bruise" on the left side of D's face, together with scratch marks. Upon questioning, M and F blamed a fall from the school bus for those marks. This was refuted by the bus driver.

On September 18, 1981, D appeared at school with additional bruising on his face and a "knot" on his forehead. Questioned by caseworkers, M said she had no idea how those injuries occurred.

D missed school Wednesday, September 30, 1981, and remained absent thereafter. School officials notified Illinois authorities of this on October 6, 1981, and the following day caseworkers found no one home at the residence of M and F. On October 8, 1981, F advised caseworkers that M had taken D and "packed up what she needed and left."

Meanwhile, on October 6, the director of the Shannon County, Missouri, office of the Division had located M and D at the home of an 84-year-old man near Birch Tree. M's sister had evidently been living there with a male friend in a "live-in relationship." The house had no running water, was dirty, sparsely furnished, and cluttered.

M reported that she had left F "because she was afraid of him, that he would hurt her physically." M and D had come to Shannon County with a male, K——— G——— (hereafter "K"). M described K as "only a friend and nothing more," even though she and K, along with D, were residing in a "camper trailer" in the yard of the home mentioned above.

M reported that F had "abused" D about two months earlier. M had come home from work and found D "hung by his hands and belt," and his face was bruised.

According to M, F had made her sign a "paper" giving him custody of their son, then 16 months old, before she left Illinois. This child was evidently the one in gestation at the time of the home study in April, 1980.

On October 8, 1981, the director of the Division's office in Shannon County, accompanied by a deputy sheriff, took custody of D from M. D was "terribly dirty" and was dressed in the same clothes he had been wearing two days earlier. He "had a terrible body odor, smelling not only of wood smoke, dirt, etc., but of feces." His hands were "crudded over" and his face "had dirt along with dried food on it."

D was delivered to the foster parents. Upon arrival, he weighed 31 pounds, 5 pounds fewer than when he was placed in M's custody 7 months earlier.

On October 27, 1981, the Juvenile Officer of Texas County filed a petition against M and the father to terminate their parental rights to D.

A second amended petition was ultimately filed, and the cause was tried November 15, 1982. By that time, D had been in the foster parents' home for 13 months, and had gained 10 or 11 pounds. M had reconciled with F, and had given birth to a second son by him, 3 months before trial. M, F, and their two sons were living in a "small mobile home" on land owned by F at Montier, Missouri.

The trial court's order terminating M's parental rights included the following findings:

"1. On March 24, 1978,[4] [D], one year of age, residing in Texas County, Missouri, with his natural parents, was found to be in need of care and treatment under

---

4. As noted *supra,* the original order placing D in the temporary custody of the Division was dated March 20, 1978. According to an entry on the docket sheet, an amended order was filed March 24, 1978. The latter order is not in the record before us.

the provisions of Section 211.031 R.S.Mo. in that the environment and associations of said child were injurious to his welfare, the natural father having deserted the family and the natural mother stating she was unable to support and care for said child, whereupon this Court ordered that said juvenile be detained and its care and custody placed temporarily in the Texas County, Missouri Division of Family Services, and until further order of court.

2. That on September 5, 1978, said juvenile was made a ward of this court after due hearing; the court finding that the natural mother was not able to provide proper care, custody and support for said juvenile, which finding was supported by the statement of the natural mother to that effect, as well as the acknowledgement of the natural father to the same effect.

3. That as a result of the September 5, 1978, hearing, the Court ordered said child to be placed in the care and custody of the Texas County, Missouri Division of Family Services, for placement in foster care.

4. That the custody of said juvenile has been under the jurisdiction of this court for more than one year immediately prior to the filing of the petition herein to terminate parental rights.

5. That the parental rights of the natural father have been terminated prior to the hearing herein.

6. That the natural mother has failed, on a continuing basis, to rectify the conditions which formed the basis of the petition herein in that she has failed to demonstrate that she can properly care for and support said juvenile and provide him with a proper home.

7. That there is reasonable cause to believe that the natural mother will not, even if given more time, rectify the existing conditions which formed the basis of the petition herein and under Section 211.031 R.S.Mo., on a regular basis and thus provide said juvenile with the proper care and support.

8. That the juvenile officer of this court and the Texas County, Missouri Division of Family Services, have used reasonable diligence and continuous efforts to aid the natural mother to rectify the conditions herein mentioned, and to provide on a continuing basis a proper home for said juvenile, and the proper moral, physical and mental training, she having failed to do so since March 21, 1978, to date of this hearing, November 15, 1982."

M's first point asserts the trial court erred in terminating her parental rights because it was not demonstrated by clear, cogent and convincing evidence that she had not rectified the conditions that existed in the spring of 1978 which constituted the basis of the Juvenile Court originally making D a ward of the Court, in that (a) she voluntarily surrendered custody originally because, under the circumstances, she conceded it was in D's best interests to be taken out of the home and made a ward of the Court, but this was no longer her position at the time of the termination hearing, and (b) at the time of the initial action by the Juvenile Court, D was being physically abused by the father, which was no longer the case.

In evaluating this point, we are mindful that the standard of review in a court-tried case where the rights of a parent have been terminated is upon both the evidence and the law as in suits of an equitable nature. Due regard is given for the opportunity of the trial court to judge the credibility of the witnesses, and the decree will be sustained unless there is no substantial evidence to support it, unless it is contrary to the weight of the evidence, or unless it erroneously declares or applies the law. *In the Interest of H.J.P.,* 669 S.W.2d 264, 270[1] (Mo.App.1984); *In the Interest of D.A.F.,* 637 S.W.2d 780, 782[1] (Mo.App.1982).

It is obvious that the trial court based the order of termination on § 211.447.-2(2)(i)b., RSMo 1978, as amended by Laws

1982, pp. 431–32.[5] That section, as so amended, provides, in pertinent part:

"2. The juvenile court may, upon a petition filed by the juvenile officer under this section, terminate the rights of parent to a child if it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist:

. . . . .

(2) When it appears by clear, cogent and convincing evidence that one or more of the following conditions exist:

. . . . .

(i) The child has come under the jurisdiction of the juvenile court pursuant to the provisions of subdivision (1), paragraph (a), (b) or (c)[6] of section 211.031, and pursuant to an order of the court under section 211.181, and thereafter:

. . . . .

b. ... the child has been under the jurisdiction of the court for one year or longer, immediately prior to the filing of the petition to terminate, and the parent has failed, on a continuing basis, to rectify the conditions which formed the basis of the petition filed under section 211.-031, and the order entered under section 211.181, and there is reasonable cause to believe that the parent will not, even if given more time, rectify those conditions on a continuing basis, and that the juvenile officer, division of family services or other agency has used reasonable, diligent and continuing efforts to aid the parent to rectify the conditions and provide on a continuing basis a proper home for the child."

Obviously, it is necessary to (1) identify the conditions that formed the basis for the amended petition of May 12, 1978, and the order entered September 5, 1978, and (2) determine whether, at the time of filing the second amended petition to terminate parental rights (December 28, 1981), M had failed, on a continuing basis, to rectify those conditions, and, if so, to determine whether there was reasonable cause to believe that she would not rectify them, even if given more time.

M concedes in her brief that one of the primary reasons for the assumption of juvenile jurisdiction over D in 1978 was the physical abuse and neglect by the father. M insists that inasmuch as she has not associated with him since the separation in 1978, and has been divorced from him since 1979, this condition no longer existed when the termination proceedings were initiated.

It is true, of course, that D has not been abused by the father since March, 1978. It is equally true, however, that the conditions under which D lived during the 7 months that he was in M's custody in 1981 were similar to those that led to the intervention of juvenile authorities in 1978.

In addition to the evidence heretofore noted, there was testimony that D's clothing was "terribly dirty" when he was picked up by the caseworkers on March 20, 1978. When first placed with the foster parents, D would "almost be wild" upon awakening from sleep. He would pull his hair, and sometimes the foster parents would have to take him for an automobile ride to calm him down.

Additionally, there was testimony that in the beginning, the foster parents had difficulty getting D to eat, but that by March, 1981, when he was restored to M's custody, he had become "a happy little fella, and he had improved both physically and mentally."

D's condition when he was returned to the foster parents October 8, 1981, was essentially the same as when they had first received him three and a half years earlier. His person and his clothing were filthy.

---

**5.** The 1982 amendment of § 211.447 took effect between the date that the second amended petition to terminate parental rights was filed and the date of trial. When the petition was filed, § 211.447, RSMo 1978, was in effect. Paragraph (h) of § 211.447.2(2), RSMo 1978, was renumbered as paragraph (i) in the 1982 amendment. Except for renumbering, that paragraph remained unchanged in the amendment.

**6.** Footnote 2, *supra.*

He had lost almost 14 per cent of his weight during his 7 months with M.

There was testimony that after being returned to the foster parents, D said M and F were mean and he never wanted to see them again. Before a bath, D would express fear of being put in cold water. He explained that F "put me in cold water when I wouldn't do my numbers and my ABC's." D also revealed that M had "put him in a closet."

This record, in the particulars recited, does, in our opinion, supply clear, cogent and convincing evidence that when D was adjudicated to be under juvenile jurisdiction in 1978 pursuant to § 211.031, the conditions that formed the basis therefor were that D, while in the custody of M and the father, was physically mistreated, his personal hygiene was neglected, and an eye infection was allowed to go untreated. These delicts constituted a failure to provide D with proper care, and the court so found in the order of September 5, 1978.

■ Likewise, there was clear, cogent and convincing evidence that during the 7 months that D was with M in 1981, similar conditions existed, in that D was physically mistreated, his personal hygiene was neglected, and his health was jeopardized, as evidenced by his serious loss of weight. There was, therefore, a failure, on a continuing basis, to rectify the conditions that formed the basis for the 1978 petition under § 211.031 and the order under § 211.-181. Additionally, the evidence established reasonable cause to believe that M would not, even if given more time, rectify those conditions on a continuing basis.

■ In so deciding, we have not ignored the testimony of M and F. Each testified that neither had mistreated D during the 7 months he lived with them, and each professed to love D the same as the two children born during their marriage. The trial court, however, was not obliged to believe that testimony. It is the prerogative of the trial court to determine the credibility of the witnesses and to accept or reject all, part or none of the testimony. *Whitenton*

*v. Whitenton,* 659 S.W.2d 542, 546[2] (Mo. App.1983); *L & K Realty Co. v. R.W. Farmer Const. Co.,* 633 S.W.2d 274, 280–81[15] (Mo.App.1982). The trial court obviously found M and F unconvincing.

There is no merit in M's argument that because D was no longer suffering abuse at the hands of the father, the order of termination lacked evidentiary support. D was physically abused while in M's custody in 1978, and D was again abused while in M's custody in 1981. The fact that the 1981 abuse was inflicted by someone other than the father nowise demonstrates that the condition was rectified. Indeed, it is reasonably inferable that the 1981 abuse was more severe than that in 1978.

The evidence also establishes that the Division used reasonable, diligent and continuing efforts to aid M to rectify the conditions that formed the basis for the 1978 proceedings. M does not contend otherwise.

Accordingly, we hold that the basis for termination of M's parental rights under § 211.447.2(2)(i)b., RSMo 1978, as amended by Laws 1982, pp. 431–32, was established by clear, cogent and convincing evidence. M's first point is ruled against her.

M's second point is based on § 211.447.-2(2)(b), RSMo 1978, as amended by Laws 1982, pp. 431–32, which authorizes termination based on neglect, as therein defined. M correctly points out that if termination be sought under that provision, one of the elements to be proved is that there was a court-approved plan to remedy the neglect. M reminds us that the only "plan" disclosed by the record was the agreement she signed October 18, 1978, and there was no evidence that said agreement ever received court approval.

Had the trial court based the order of termination on § 211.447.2(2)(b), there would be merit in M's argument. We have earlier concluded, however, that termination was based on § 211.447.2(2)(i)b. Consequently, M's second point is inapposite.

Judgment affirmed.

GREENE, C.J., FLANIGAN, P.J., and TITUS, J., concur.