In the Interest of M.B.A., N.H.A. and B.W.A., Minors,

E.A.N., Appellant.

No. 14012.

Missouri Court of Appeals, Southern District, En Banc.

April 29, 1986.

Gerald D. McBeth, Ewing, Carter, McBeth, Smith, Gosnell, Vickers & Hoberock, Nevada, for appellant.

Ronald F. Fisk, Nevada, for respondent Juvenile Officer.

Samuel J. Short, Jr., Stockton, for respondent guardian ad litem.

MAUS, Judge.

On September 18, 1981, the Juvenile Officer of Cedar County filed a petition to terminate the parental rights of E.A.N. (hereinafter mother) to her three children then in the actual custody of foster parents. The initial "N" is from the name of the mother's second husband. After an initial appearance by the parties on April 29, 1982, and numerous subsequent delays, a plenary hearing was held on September 9, 1983. A judgment terminating those parental rights of the mother was entered on August 31, 1984. After further delay, the mother's appeal reached the January, 1986, docket of Division II of this court. It was re-argued before the court en banc on February 19, 1986.

Those dates have been mentioned for two reasons. The first is to note the inordinate delay in the determination of the future of these children. This is not to assign fault, but to emphasize that those concerned were charged with knowledge of the need for an early determination of a stable home environment for those children. The demand for expeditious determination of cases such as this, clearly stated by Judge Welliver in *D.G.N. v. S.M.*, 691 S.W.2d 909 (Mo. banc 1985), must be observed.

The second reason is to focus attention upon the statutory period that is the basis for a decision in this case. That period is six months prior to September 18, 1981. § 211.447.2, RSMo 1978. The following is a condensation of the evidence.

The mother was 18 years of age when, on November 21, 1974, she married M.A. (hereinafter father) who was then 17 years of age. They lived in northwest Kansas. Initially they resided with his mother. They were living with her on May 1, 1975, when their son M.B.A. was born. Thereafter, they moved to a trailer. Their daughter, N.H.A., was born on November 7, 1976. Apparently, the relationship between the parents began to deteriorate about this time.

In mid 1977, they were told they had to move the trailer from the lot on which it was located. They were behind in the pay-

ments on the trailer. When the mother was eight months pregnant with her third child, B.W.A., the father left. B.W.A. was born November 13, 1977. The father's whereabouts were unknown for four months.

After the father left in October of 1977, the mother claimed his vacation check estimated to be approximately $200. She received "welfare." On a date not clear from the record, the mother abandoned the trailer. She moved into an apartment in the basement of an old building. The apartment consisted of a kitchen, a living room and a bedroom. A bath was shared with another basement apartment.

The two older children received outpatient treatment or hospital care on numerous occasions during 1976 and 1977. On March 5, 1977, N.H.A., the daughter, was found to be suffering from malnutrition. In June, 1977, by an anonymous call, the Kansas Department of Social and Rehabilitation Services was informed that the mother was neglecting her children. That department then provided health services and counseling to the mother. Records disclose several diagnoses of respiratory and ear infections.

After the mother learned she was pregnant with her third child, B.W.A., she determined she did not want that child. She did not want to give the child to her mother-in-law, because that would not be fair to her parents. In August, 1977, the mother-in-law called the father's great aunt, a woman 42 years of age, and asked her if she wanted the unborn child. After a discussion with her husband, the aunt called back and told the mother-in-law they would accept the baby. At this point, it should be noted that the aunt and her husband had lived in northwest Kansas. But, in June of 1976 they moved to Cedar County, Missouri. The aunt had been acquainted with the father and the mother. In 1975, the aunt gave the mother several items for the care of her first child, M.B.A. When the aunt was in northwest Kansas at Christmas, 1977, she was told by the mother-in-law that the baby had been born, but the moth-

er said her brother was going to take the children.

By February, 1978, living conditions for the children had deteriorated. It may be summarized that they were not properly housed, clothed, fed or bathed. By her own admission she was not a good mother. She resented B.W.A. For example, she held him to feed him only one time after his birth. On other occasions she would prop the bottle in his mouth. She said she was severely depressed and lost interest in everything. Her diet consisted of Cokes and cigarettes.

On January 31, 1978, B.W.A. had been admitted to a hospital suffering from pneumonia. A social worker and two physicians called the aunt to see if she and her husband would accept the children. On February 3, 1978, the aunt drove to northwest Kansas to do so. She found the mother and the two older children living in the basement apartment in deplorable conditions. The children slept on a mattress on the floor in a closet. The mattress was soiled by urine and feces. Those children were unkempt and dirty.

The aunt had taken with her a petition to the Probate Court of Cedar County for the appointment of the aunt and her husband as guardians of the children. After a lawyer explained the form, the mother signed a consent to this appointment. She also signed a "consent to custody" statement which recited the aunt and her husband were to have custody of the children until she was able to care for them. On February 4, 1978, the children were brought to Missouri to live in the custody of the aunt and her husband. On February 17, 1979, the mother executed a consent for the aunt and her husband to adopt B.W.A. At the time she understood she was giving up all of her rights relative to B.W.A. Since being brought from Kansas, the three children have lived in the home and under the care of the aunt and uncle.

The record concerning the subsequent whereabouts and activities of the mother is not entirely clear. She said that from February, 1978, to February, 1979, she lived a

lot of places; with her sister in Oklahoma, and in Goodland, Colby, Atwood and Overland, Kansas. In March, 1978, the father returned. They were reconciled, but did not long live together. She stayed in Atwood where she worked at a cheese plant for $3.25 per hour. The father worked in Hayes, Kansas. In April or May, 1979, he started working in the oil fields near Galveston, Texas. In May, 1979, the father, to whom the mother was yet married, was killed in a motorcycle accident.

The mother testified that in 1980 she settled in Ellis, Kansas. In 1980 she saw a psychiatrist or a psychologist six times. Welfare paid for one additional visit, which she was saving in case she needed it. She testified that for two and one-half years before the hearing she had been employed in a cafe in St. Francis, Kansas. By reference to the calendar it is determined she started this work about March 9, 1981. She worked at the cafe 36 hours per week for $3.35 per hour.

Sometime before her husband's death, the mother entered into a relationship with T.N. At an indefinite time she started living with T.N. In September, 1981, the mother and T.N. were married. At the time of the hearing he was employed by the highway department and made $935 per month gross. She testified his take-home pay was $605 per month.

At Easter and Christmas, 1978, the aunt went to western Kansas for visits. The children accompanied her. The mother saw the children at her former mother-in-law's. The aunt and the children have been on occasional subsequent visits to western Kansas. On those visits she did not specifically notify or seek out the mother. She assumed the mother would know through relatives. The aunt further stated she seldom knew the mother's address. There was evidence the aunt had written letters to the mother on January 12, 1979, to an address in Blackwell, Oklahoma, and on August 30, 1982, to an address in St. Francis, Kansas. The mother has not seen the children since Christmas, 1978.

Since approximately two months after the father's death, the aunt and her husband, on behalf of the children, have received $939 per month Social Security benefits by reason of the father's death. The mother sent M.B.A. $10 on a birthday. This was placed in his savings account. One Easter the mother sent each child a $2 bill which have been kept for them. The mother has made no other contribution in any form for the support of those children.

Evidence established that from February 4, 1978, through 1981 there were only the following communications and contacts between the mother and the children.

By Telephone:

| 1978 | — | One (1) Call |
| 1979 | — | Three (3) Calls |
| 1980 | — | One (1) Call |
| 1981 | — | One (1) Call |

By Gifts:

| 1978 | — | Christmas One (1) Gift—Each child |
| 1979 | — | None |
| 1980 | — | One (1) Pants and vest to one child One Shirt each to other two (2) children |
| 1981 | — | None |

By Letters:

| 1978 | — | Ten (10) letters |
| 1979 | — | Six (6) letters |
| 1980 | — | Two (2) letters |
| 1981 | — | Two (2) letters |

By Visitation:

| 1978 | — | Two (2) visits not at mother's arrangement |
| 1979 | — | None |
| 1980 | — | None |
| 1981 | — | None |

In 1982 there were two letters and in January, 1983, the mother delivered a Christmas box to the aunt.

In May, 1978, by letter, the mother told the aunt she was going to pick up the children. She did not do so. The aunt testified that in May, 1979, she and her husband filed a petition for custody. The nature of that action was not further explained by testimony or exhibit. The aunt also testified that in April, 1980, she and her husband filed a "Petition to Terminate." That action is yet pending. The nature of that action was not further explained by exhibit. However, from other

testimony it is apparent this was a petition for adoption based upon abandonment and neglect.

By her brief and argument, the mother refers to an oral order by the trial court that she could not visit the children. It must be noted that trial and appellate counsel for the mother did not represent her at the time of that alleged order. There is no such order in the record. The mother's testimony concerning that order follows: "Well, my lawyer, Robert Payne, asked the Judge permission. After we found out the court was canceled, asked the Judge if I may have permission to see the children. And Sam Short stood up and said that he thought it would be emotional strain on the children and the Judge denied me." She further stated:

Q. Is it your understanding of the request that you told the Court about to see the children, was to see them on that day while you were here?

A. Yes.

Q. And was it that specific date that the Judge denied?

A. Yes.

The appearance referred to was the April 29, 1982, hearing.

The mother's first point on appeal is that the trial court erred in denying her motion to dismiss "based on the interference of the foster parents in this termination of parental rights case." She relies upon *Matter of Trapp*, 593 S.W.2d 193 (Mo. banc 1980) and In *Interest of M___ K___ P___*, 616 S.W.2d 72 (Mo.App.1981). *Trapp* was a neglect proceedings in which the issue was the fitness of a natural mother to have her children returned to her. It held that foster parents who desired to adopt those children did not have a legal "interest relating to" that action which would permit them to intervene as a matter of right under Rule 52.-12(a)(2). *Trapp* observed there was a policy reason for not permitting such intervention. That reason was that such intervention would interject the false issue of the fitness of the foster parents to have custody. Citing *Trapp*, In *Interest of M___ K___ P___*, supra, held it was error to permit

foster parents to intervene in a termination proceedings. However, in that case the court found the participation of the intervening foster parents and their attorney did not sufficiently "taint" the proceedings so as to require reversal.

■ *Trapp* does not establish error in this case. The foster parents, the aunt and her husband, were not permitted to intervene. It was not improper for them to institute and maintain an action to adopt the children based upon the mother's neglect and abandonment. Nor was it improper for them in that action to cause depositions to be taken in Kansas. Those depositions were taken by agreement of counsel for the foster parents, the juvenile officer and the mother for use in the adoption proceedings and the termination proceedings. Nor was an impropriety established because the mother personally attended those depositions, but her counsel did not.

■ Initially the trial court determined the foster parents could remain in the courtroom as observers. However, they were excluded when "the Rule" was invoked. The aunt was a proper and necessary witness. One of the attorneys for the foster parents participated as a witness to identify relevant documents. The aunt's testimony concerning the condition of the children when placed in her custody was relevant to establish the absence of parental concern and the extent of neglect by the mother. Her testimony concerning their subsequent condition was relevant to show their retarded physical and mental development due to neglect and their recovery therefrom. That recovery was dramatically illustrated by a comparison of pictures of the children taken on February 4, 1978, and in September, 1979.

Assuming that participation by the foster parents could have tainted the termination proceedings to such an extent as to require dismissal, that was not true in this case. It does not aid the mother to complain that, through the foster parents, evidence relative to the basis for termination and the

best interests of the children was presented to the court. See § 211.464, RSMo Supp. 1985.

The mother has stated several additional points. However, the thrust of those points is that a statutory basis for termination was not established by clear, cogent and convincing evidence as required by § 211.447.2(2), RSMo 1978. In considering that contention, the following precepts are to be observed.

> While the reviewing court must examine whether the trial court applied the correct standard of proof, '[d]ue regard is given for the opportunity of the trial court to judge the credibility of the witnesses and the decree will be sustained unless there is no substantial evidence to support it, unless it is contrary to the weight of the evidence, or unless it erroneously declares or applies the law.'

*D.G.N. v. S.M.*, supra, at 912. In evaluating the evidence it was "the prerogative of the trial court to determine the credibility of the witnesses and to accept or reject all, part or none of the testimony." In *Interest of D___ V___ V___*, 677 S.W.2d 396, 402 (Mo.App.1984). It was likewise the province of the court to draw reasonable inferences from the evidence. In reviewing the evidence pertaining to issues upon which no finding has been made, this court shall view that evidence as favorable to the result reached by the trial court. *In Re Adoption of K.L.G.*, 639 S.W.2d 619 (Mo. App.1982).

Section 211.447.2, RSMo Cum.Supp.1984, in part provides, "The juvenile court may ... terminate the rights of parent to a child if it finds that such termination is in the best interest of the child and *one or more* of the following conditions are found to exist:" (emphasis added). The subject petition alleged the termination was in the best interest of the children and sought termination upon the basis of neglect and abandonment. During oral argument the mother conceded that her appeal was without merit if the evidence supported a determination of either neglect or abandonment.

Section 211.447.2 authorizes termination:

(2) When it appears by clear, cogent and convincing evidence that ...

(a) The parent has abandoned the child. The court may find that the parent has abandoned the child if, for a period of six months or longer ... either of the following has occurred:

....

b. The parent has, without good cause, left the child without any provision for support and without any communication or visitation from the parent. Evidence that the parent has acted to support, to communicate with or to visit the child during the period may be disregarded if such acts of the parent appear to have been merely a token effort

.....

The applicable statutory period of six months was the six months preceding September 18, 1981. Cf. *In Re Adoption of W.B.L.*, 647 S.W.2d 531 (Mo. banc 1983), aff'd. 681 S.W.2d 452 (Mo. banc 1984). The evidence was that during this period the mother made no provision for the support of the children. During the entire year of 1981, her only communication with the children was by one phone call and two letters. There were no gifts. She did not visit nor see the children. The mother seeks to avoid this uncontroverted evidence by many arguments and excuses.

She argues there was no evidence she knew of her right to visit the children. The utter speciousness of this argument and purported excuse is established by her own testimony. In her testimony she acknowledged receiving "some papers" relative to custody or transfer of custody in 1979. Thereafter, the following questions were asked of and answers given by the mother.

Q. Okay. Did you think that you could see them anytime you wanted to?

A. Yes.

Q. Even after you got these papers?

A. Yes.

Q. And did you try to see them after you got these papers?

A. No.

Q. When did you try to see them next after you got these papers?

A. When we came to Court was the only time I've ever tried.

The mother vaguely testified that some letters she wrote the children at an undisclosed time for an unstated reason were returned. In argument she ascribes that return to the foster parents. The record does not support that argument. She excuses her failure to telephone the children by a direction from the aunt to call only when the aunt was at home. The aunt testified she merely refused to accept charges on collect telephone calls made by the mother.

■ The mother argues that there was no failure of support because no demand was made upon her. She also cites the Social Security benefits received by the aunt and her husband on behalf of the children. A demand was not required to impose upon the mother a duty for some responsibility for the support of her children. The fact that support was supplied from another source does not obliterate that duty.

Under appellant's theory a parent could have absolutely no contact with his child, spend no money on the cost of raising his child, and take no responsibility for rearing his child and yet still not abandon his child because he first asked someone else to take care of the child. Such a theory is contrary to established definitions of abandonment.

*H.D. v. E.D.*, 629 S.W.2d 655, 658 (Mo.App. 1982). Even though other funds were available for the support of the children, contributions from the mother could have freed those funds for accumulation for their future needs. The record does not support her contention she was unable to contribute anything to that support. In 1980 for several months she earned $130 per week. During the statutory period she earned $120 per week while living with T.N.

The mother also seeks to excuse her actions because of depression caused by the father leaving the family. There can be no doubt this created emotional stress. But, her prior irresponsible behavior and indifference toward her children has been noted. For example, months before the father left, N.H.A. had been admitted to a hospital with a diagnosis of malnutrition. Because of the mother's neglect, the Kansas Department of Social and Rehabilitation Services had instituted a program of medical services and counseling. The father did not leave the family until the mother was eight months pregnant with B.W.A. who was born on November 13, 1977. By August, 1977, the mother had determined she did not want that baby and sought someone to adopt him. The extent of her depression is also dispelled by her conduct with T.N. before and after the husband's death otherwise discussed in this opinion.

She seeks to excuse her failure to visit the children by reason of her distraught condition, the distance and her poverty. It is sufficient to observe that the mother had a relationship with T.N. before her husband's death. T.N., who attended the funeral, guessed "they dated" the night following the funeral. As noted, during the statutory period they were living together and she earned $120 per week.

■ Finally, relying upon *Trapp,* the mother contends that abandonment means a willful, positive act with the intention that the severance be permanent. She argues the evidence does not establish such an intent. She emphasizes her depression, which has been discussed, and insists there was no abandonment because the children were delivered to the aunt until she "was able to care for them." It is true, a temporary arrangement for custodial care does not constitute abandonment. *H.D. v. E.D.,* supra; *In Re Ayres,* 513 S.W.2d 731 (Mo. App.1974). But, such an initial understanding cannot serve as an excuse for an indefinite disregard for such children. The mother was charged with the knowledge that "[o]f one thing we can be certain, every day that a child in its formative years is left in a stable parent-child relationship, natural or foster, the greater the potential for harm to the emotional well

being of the child should it be necessary to order a change of custody." *D.G.N. v. S.M.*, supra, at 914. By service of the adoption petition in 1979, the mother was put on notice that her actions were construed and alleged to have constituted abandonment and the temporary arrangement was over. Yet, she continued almost non-existent contact with the children.

"Whether or not there has been an abandonment—or repentance of abandonment—requires an examination of the parent's intent, *an inferred fact,* determined by considering all the evidence of the parent's conduct ... including that before and after the statutory period." *In Re Adoption of W.B.L.,* 681 S.W.2d 452, 455 (Mo. banc 1984) (emphasis added) (citations omitted).

 The mother's excuses for her failure to support, communicate and visit with her children during the statutory period are asserted without justification or a factual basis. As in *In Re Adoption of W.B.L.,* 681 S.W.2d 452, supra, "[i]t is of critical significance that in virtually every instance these excuses were directly contradicted and impeached." Id. at 456. By its judgment, the trial court found those excuses " 'not credible,' " and " 'unconvincing and transparent.' " Id. at 456. From the facts, "the trial court could, and did, find for a period of more than six months mother had abandoned [her children] since mother's actions to support, to communicate with, and to visit [her children] were merely token efforts." *In Interest of Gowen,* 610 S.W.2d 319, 321 (Mo.App.1980). The determination of the trial court is supported by the evidence. See *In Re Adoption of W.B.L.,* 681 S.W.2d 452, supra; *J.H.H. v. J.D.,* 662 S.W.2d 893 (Mo.App.1983); H.D. v. E.D., supra.

As the judgment supports the determination of abandonment, it is not necessary to expressly consider the issue of neglect. *In Interest of H.J.P.,* 669 S.W.2d 264 (Mo.App. 1984). It was conceded at oral argument that termination was in the best interest of the children. That concession is established by the evidence. The judgment is affirmed.

HOGAN, TITUS, FLANIGAN, GREENE and CROW, JJ., concur.

PREWITT, C.J., dissents and files dissenting opinion.

PREWITT, Chief Judge, dissenting.

I respectfully dissent. I believe the evidence falls well short of showing abandonment of the children for the six months preceding September 18, 1981.

Section 211.447.2(2)(a)b, RSMo Supp.1984 (since amended, see RSMo Supp.1985), under which the principal opinion finds abandonment, states in part that abandonment occurs if the "parent has, without good cause, left the child without any provision for support and without any communication or visitation from the parent." Abandonment under this section requires both a finding of failure of support and a failure to communicate with or visit the children within the statutory period. *J.H.H. v. J.D.,* 662 S.W.2d 893, 896 (Mo.App.1983).

Here, during the six months preceding September 18, 1981, the period during which the principal opinion finds that the abandonment must have occurred, the children were receiving adequate support through social security benefits of $939.00 per month. The principal opinion notes that "contributions from the mother could have freed those funds for accumulation for their future needs." That appears irrelevant to me. The statute requires that the children be left without any provision for support and this obviously did not happen within the relevant period.

As there was provision for the children's support all during the six months prior to September 18, 1981, abandonment as found in the principal opinion could not have occurred.

I also do not believe that the evidence shows that the mother "without good cause ... left" the children "without any communication or visitation" from her. Distance, her financial condition, and other factors made communication and visitation difficult. The children were placed with the

aunt on February 4, 1978. In May of 1979 and April of 1980 the aunt and her husband filed actions against the mother, one suit apparently seeking adoption, and the other termination of the mother's parental rights.

During the relevant period of abandonment, at least one and possibly two lawsuits were pending against the mother. By these she knew, or reasonably could have believed, that her visitation would be restricted or prohibited, as it was when in April of 1982 she sought from the trial court and was denied permission to see the children. This denial was admitted by respondents' counsel in oral argument. Since May of 1979 the mother has been involved in litigation over the children and has been seeking them. This strongly indicates that she was not abandoning or disregarding them.

The weakness in the evidence of abandonment during the relevant period is apparent in that respondent, as does the principal opinion, refers extensively to what happened before that period. While we cannot view the six months in a vacuum, the undue emphasis on the prior period, when the mother was unable to care adequately for the children, does not correct the absence of evidence needed to establish that abandonment occurred during the critical period.

Aside from the statute on which the principal opinion relies, abandonment has not otherwise been shown. The children were left with a relative for their own good and no intent to abandon was present. Abandonment is the willful giving up of a child with the intention that the severance be of a permanent nature. *In Interest of W.F.J.*, 648 S.W.2d 210, 215 (Mo.App.1983). "As defined in Missouri case law, abandonment implies a willful, positive act such as deserting the child." Id.

Where there is good cause a parent may leave a child in the custody of a third person without abandoning the child. *J.H.H. v. J.D.*, supra, 662 S.W.2d at 896; *H.D. v. E.D.*, 629 S.W.2d 655, 658 (Mo.App. 1982). The mother made the arrangements with their father's great aunt because she

thought these arrangements were in the best interest of the children at that time.

*In re Ayres*, 513 S.W.2d 731, 735 (Mo. App.1974), is applicable here. That opinion said:

> [W]e would set a dangerous precedent of charging the parents with neglect and depriving them of the natural custody of their children if every time parents placed the physical custody of their children with a surrogate or a member of their extended family because of a temporary inability—on account of economic reasons, illness, marital disruptions or otherwise fail to provide for their children. On principle, when tragedy strikes and the parents are beleaguered by problems beyond their control, in our opinion, a placement with a more fortunate relative or concerned friend would appear to be the best thing reasonable, concerned, caring parents could do for their children.

The result of the present case is a warning to parents that if they place their children temporarily with someone else, no matter how good the reason, they are in danger of permanently losing them. By this decision we are discouraging parents from placing their children temporarily with another even though the welfare of the children would demand it.

There is no serious dispute that at the time of trial that the mother was capable of caring for the children. I am convinced that my colleagues who have voted to affirm this matter believe what they are doing is in the "best interest" of the children, perhaps, at least in part, because of the length of time the children have spent with the aunt and her husband. Whether the children remain there after this decision is out of our control. In addition, the length of time was not caused by the mother but by the litigation over the children. The result here allows the foster parents to take advantage of delay created by them, the juvenile officer, and our legal system in this and in the other two legal actions.

I also do not believe that this action should have been brought. This case did not call for the involvement of the juvenile officer. Juvenile officers should be aiding children who need their immediate help, and not seeking to terminate parental rights to aid others with their adoption petition. The welfare of the children was not critical if the great aunt was properly caring for them, as the juvenile authorities obviously thought she was.

To terminate parental rights, there must be strict and literal compliance with the statutes. *In Interest of R.L.H.*, 639 S.W.2d 241, 241–242 (Mo.App.1982). Only when grave and compelling reasons exist should parental rights be severed; the test is not whether the children would be "better off" with someone else. *In Interest of A.R.S.*, 609 S.W.2d 490, 491 (Mo.App.1980).

Because I do not believe that abandonment of the children was established, I must dissent.